UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ANTHONY WILLOUGHBY | : | |
| | : | |
| Plaintiff: | : | Civil Action No. |
| | : | 3:11-CV-00992-CSH |
| v. | : | |
| | : | |
| CONNECTICUT CONTAINER | : | |
| CORP., | : | July 27, 2012 |
| | : | |
| Defendant. | : | |

MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT AND FOR LEAVE TO AMEND ITS ANSWER

**ABBOTT, REISS & ALLEN, P.C.**
Attorneys for Defendant
Guy M. Allen, Esq. (phv0226)
90 Merrick Avenue, Suite 501
East Meadow, New York 11554
P: (516) 222-1300
F: (516) 222-1311
gallen@abbottreissallen.com

**EPSTEIN BECKER & GREEN, P.C.**
Attorneys for Defendant
Dean R. Singewald II, Esq. (ct16708)
One Landmark Square, Suite 1800
Stamford, Connecticut 06901-2601
P: (203) 348-3737
F: (203) 324-9291
dsingewald@ebglaw.com

# TABLE OF CONTENTS

INTRODUCTORY STATEMENT AND SUMMARY ARGUMENT ..................... 1

A.    ADA Claims ....................................................... 2

     1.    The ADA Disability Termination Claim ............................... 3

     2.    The ADA Failure to Accommodate Claim ........................... 4

     3.    Plaintiff's ADA Retaliation Claim .................................... 5

B.    Plaintiff's CFEPA Claims ........................................... 6

C.    Plaintiff's FMLA Claims ............................................ 6

D.    Plaintiff's Intentional Infliction of Emotional Distress Claim ..................... 7

E.    Plaintiff's Negligent Infliction of Emotional Distress Claim .................... 8

STATEMENT OF MATERIAL FACTS ........................................... 9

     CONNECTICUT CONTAINER'S KNOWLEDGE OF WILLOUGHBY'S
     MEDICAL SITUATION PRIOR TO AUGUST 20, 2009 ....................... 9

     PLAINTIFF'S MEDICAL CONDITION ON OR AROUND AUGUST 20, 2009,
     MORE THAN FIVE MONTHS AFTER HE SUBMITTED HIS FMLA FORM ...... 12

     THE INCIDENT OF AUGUST 21, 2009 .................................. 13

     THE DAYS FOLLOWING THE INCIDENT OF AUGUST 21, 2009 ............. 14

     THE ARBITRATION AND SETTLEMENT ............................... 17

     PLAINTIFF'S REQUEST FOR ACCOMMODATION (OR LACK THEREOF) ..... 19

     RETALIATION ................................................... 19

     FMLA ......................................................... 20

     INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS .................. 20

     NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS .................... 21

LEGAL ARGUMENT ........................................................ 21

I.      SUMMARY JUDGMENT STANDARD ................................... 21

II.     PLAINTIFF'S CLAIMS UNDER THE ADA ARE WITHOUT MERIT ........... 22

        A.      Plaintiff Was Not Disabled Under the ADA ........................... 23

        B.      The Company Terminated Plaintiff for a Legitimate Non-
                Discriminatory Reason and Plaintiff Cannot Establish Pretext for
                Discrimination ................................................ 26

        C.      Plaintiff's Failure to Accommodate Claim Must Be Dismissed
                Because Plaintiff did Not Ask for an Accommodation and There Was
                No Obvious Reason to Provide an Accommodation ...................... 28

        D.      Plaintiff's Retaliation Claim Under the ADA Must Fail Because He
                Either Did Not Engage in Protected Activity or Suffer From an
                Adverse Job Action .............................................. 29

                1.      Plaintiff's Retaliation Claim Regarding His Termination ............ 30

                2.      Plaintiff's Retaliation Claim After His Return to Employment ........ 30

III.    PLAINTIFF'S CFEPA CLAIMS SHOULD BE DISMISSED FOR LARGELY
        THE SAME REASONS AS HIS ADA CLAIMS ........................... 31

IV.     PLAINTIFF'S FMLA CLAIM SHOULD BE DISMISSED BECAUSE: IT IS
        PRECLUDED BY THE SETTLEMENT AGREEMENT; AND PLAINTIFF FAILS
        TO ALLEGE ANY FACTS THAT HE GAVE ANY NOTICE OF HIS NEED OR
        INTENTION TO TAKE FMLA LEAVE ................................. 32

        A.      Plaintiff's FMLA Claim Was Released Pursuant to Settlement
                Agreement .................................................... 32

        B.      Plaintiff's FMLA Claim is Not Support by the Undisputed Facts ........... 33

V.      PLAINTIFF'S CLAIMS OF INTENTIONAL AND NEGLIGENT INFLICTION OF
        EMOTIONAL DISTRESS ARE: RELEASED UNDER THE SETTLEMENT
        AGREEMENT; BARRED BY THE EXCLUSIVITY PROVISION OF THE
        CONNECTICUT WORKERS' COMPENSATION ACT AND ARE, ON THEIR
        FACE, FACTUALLY AND LEGALLY DEFICIENT ...................... 34

A.   Plaintiff's Claims of Intentional Infliction of Emotional Distress ("IIED") and Negligent Infliction of Emotional Distress ("NIED") Were Released Under the Settlement Agreement ........................ 34

B.   Plaintiff's IIED and NIED Claims are Barred by the Exclusivity Provisions of the Workers' Compensation Statute ....................... 34

    1.   To the Extent Necessary, the Company Should be Granted Leave to Amend its Answer to Assert the Workers' Compensation Bar as an Affirmative Defense ............................................... 35

C.   Plaintiff Fails to State a Cause of Action for Intentional Infliction of Emotional Distress ....................................................... 36

D.   Plaintiff Fails to State a Claim for Negligent Infliction of Emotional Distress ....................................................... 39

CONCLUSION ......................................................... 40

# TABLE OF AUTHORITIES

## CASES

*Agostinello v. Great Neck Union Free School District,*
   2009 WL 238865 (E.D.N.Y. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Alexandra v. Strong,*
   81 Conn. App. 68, 71 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242, 256 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Anthony v. City of New York,*
   339 F.3d 129, 138 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Appleton v. Board of Educ. of Stonington,*
   254 Conn. 205, 210, 757 A.2d 1059, 1062 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Bernard v. N.Y. City Health and Hosps. Corp.,*
   1996 WL 457284, at *7 (S.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Bellamy v. General Dynamics Corp.,*
   2012 WL 198171, *5 (D. Conn. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 6, 24, 32

*Brady v. Wal-Mart Stores,*
   531 F.3d 127, 135 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Bragdon v. Abbott,*
   524 U.S. 624, 118 S. Ct. 2196, 141 L. Ed.2d 540 (1998) . . . . . . . . . . . . . . . . . . . . 2, 24, 25

*Brown v. State of Connecticut,*
   2010 WL 2220580, *17 (D. Conn. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 29

*Buck v. AT&T Servs., Inc.,*
   2010 WL 26440045, *1 n.1 (D. Conn. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 31

*Buotote v. Illinois Tool Works, Inc.,*
   815 F.Supp.2d 549, 556 (D. Conn. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 6, 24, 32

*Busiede v. Providence Health Sys-Oregon,*
   2006 WL 3827460 (D. Ore. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Carone v. Mascolo,* No. 3:06 CV 1094,
   2008 U.S. Dist. LEXIS, 60771 (D. Conn., Aug. 7, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Carreras v. Sajo, Garcia and Partner,*
  596 F.3d 25 (1st Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Celotex Corp. v. Catrett,*
  477 U.S. 317, 322-23 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*Conzo v. Aetna Ins. Co.,*
  243 Conn. 677, 680-81 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Cousins vs. Howell Corporation,*
  113 F.Supp.2d 262, 270 (D. Conn. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 25

*Cruz v. Coach Stores, Inc.,*
  202 F.3d 560, 566 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Cyrus v. Papa's Dodge, Inc.,*
  2012 U.S. Dist. LEXIS 42618 (D. Conn. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 38

*Dicara v. Connecticut Rivers Council,*
  663 F.Supp.2d 85, 95 (D. Conn. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 34

*Earl v. Wyeth, Inc.,*
  603 F.Supp.2d 556, 573 (S.D.N.Y. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Farina v. Branford Bd. of Education,*
  2010 WL 3829160 (D. Conn. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4, 23, 29

*Goenaga v. March of Dimes Birth Defects Foundation,*
  51 F.3d 14, 18 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*Goldieri-Ambrosini v. National Realty and Development,*
  136 F.3d 276 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Graves v. Finch,*
  457 F.3d 181, 184 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 28

*Green v. Toburen,*
  CV 980063898S, 2000 WL 894680, *3-4 (Conn. Super. June 2000) . . . . . . . . . . . . . . . . . . 35

*Gregory v. Southern New England Telephone Co.,*
  896 F.Supp. 78, 84-85 (D. Conn. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 35

*Grosso v. UPMC and Biotronics,*
  2012 WL 787481, at *11 (W.D.Pa. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

v

*Gurliacci v. Mayer,*
  218 Conn. 531, 567, 590 A.2d 914 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Heilweil v. Mount Sinai Hospital,*
  32 F.3d 718, 722 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Hooven-Lewis v. Caldera,*
  249 F.3d 259, 268 (4th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Hopkinson v. Peninsula Hospital Center,*
  2010 WL 5067702 (E.D.N.Y. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Huff v. West Haven Bd. of Ed.,*
  10 F.Supp. 2d at 117, 122-23 (D. Conn. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Jancewicz v. SNET Co.,*
  54 F.Supp.2d 134, 135 (D. Conn. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Kramer v. Hickey-Freeman,*
  142 F.Supp.2d 555, 560 (S.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Lapuk v. Robert Simons,*
  1995 Conn. Super. LEXIS 5, at *9, 17, *aff'd*, 41 Conn. App. 750,
  *cert. denied*, 239 Conn. 926, 677 A.2d 24 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Little v. Yale University,*
  92 Conn. App. 232, 239-40, 884 A.2d at 431-32 (2005)
  (internal quotation marks and citations omitted),
  *cert. denied,* 276 Conn. 936, 891 A.2d (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Lugo v. Shinseki,*
  2010 WL 1993065, at *7 (S.D.N.Y. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Mann v. Patrick Donahoe, Postmaster General,*
  2012 U.S. Dist. LEXIS 22185 (D. Conn. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 24

*McDonnell Douglas Corp. v. Green,*
  411 U.S. 792 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*McGrath v. Yale Corp.,*
  No. CV920326144, 1993 WL 182370, at *4 (Conn. Super. Ct. May 17, 1993) . . . . . . . . . . . 37

*Meiri v. Dacon,* 759 F.2d 989, 995 (2d Cir. 1985),
  *cert. denied*, 474 U.S. 829 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 26

*Meyers v. Arcudi,*
  915 F.Supp. 522, 524 (D. Conn. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Monahan v. N.Y. City Dept. of Corr.*,
   214 F.3d 275, 283 (2d Cir. Civ. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 35

*Muldoon v. Homestead Insul. Co.*,
   231 Conn. 469, 482, 650 A.2d 1240 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Muniz v. Kravis*,
   59 Conn. App. 704, 708-09, 757 A.2d 1207, 1211 (2000) . . . . . . . . . . . . . . . . . . . . . . . . 38

*Nixon-Tinkelman v. New York City Dep't of Health and Mental Hygiene*,
   2011 U.S. App. LEXIS 16569 at *5 (2d Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Parsons v. United Technologies Corp.*,
   243 Conn. 66, 88-89 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Perry v. Department of Correction*,
   2012 WL 1108551 (D. Conn. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 27, 28

*Price v. Mount Sinai Hospital*,
   2012 WL 313577, *12 (2d Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 25

*Quimby v. Kimberly Clark Corp.*,
   28 Conn. App. 660, 666 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Ragusa v. Malverne Union Free School District*,
   381 F. App'x, 85, 88 (2d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 24, 27

*Reed v. State*,
   2001 WL 335838, at *4 (D. Conn. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Rivera v. City of Torrington Board of Education*,
   2008 WL 2414306, *5 (D. Conn. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 29

*Rizzo v. New Haven Register*,
   No. CV02467267, 2005 WL 2857463, at *4-5 (Conn. Super. Ct. Oct. 7, 2005) . . . . . . . . . . . 38

*Roberts v. Area Cooperative Educational Services*,
   210 Conn. Super. LEXIS 240 (Co. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 33

*Roberts v. Circuit-Wise, Inc.*,
   142 F.Supp.2d 211, 218 (D. Conn. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Schneider v. Shah*,
   2012 U.S. Dist. LEXIS, 49379, *21 (D.N.J. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Scinto v. Stamm*,
   224 Conn. 524, 520 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

vii

*Sims v. Honda Motor Corp.,*
   225 Conn. 401, 405 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Stancuna v. Schaffer,*
   122 Conn. App. 484, 490 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Stapleton v. Monro Muffler,*
   2003 Conn. Super. LEXIS 321 (Conn. Super. Feb. 3, 2003) . . . . . . . . . . . . . . . . . . . . . . . 38

*State Teachers Ret. Bd. v. Fluor Corp.,*
   654 F.2d 843, 856 (2d Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Swierkiewicz v. Sorema N.A.,*
   534 U.S. 506, 512 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Thompson v. USL Unico Service Company,*
   750 F.Supp.2d 907, (W.D. Tennessee 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Tomick v. United Parcel Service, Inc.,*
   135 Conn. App. 589, 612 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 31

*Ward v. United States Surgical Division of Tyco Healthcare,*
   2005 WL 2972974, *10 (D. Conn. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 24

*Weinstock v. Columbia Univ.,*
   724 F.3d 33, 41 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Wells v. Plainfield,*
   2005 Conn. Super. LEXIS 65 (Jan. 11, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 38

*Woodman v. WWOR-TV, Inc.,*
   411 F.3d 69 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

**REGULATIONS**

C.F.R. § 825.500(g)(1-(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 27

§ 31-5199-43(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 33

**RULES**

Fed. R. Civ. P. 8(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Fed. R. Civ. P. 15(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Fed. R. Civ. P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**STATUTES**

C.G.S. § 31-284(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

28 U.S.C. § 1367(c)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

42 U.S.C. § 12101 *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

42 U.S.C. § 12101(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

42 U.S.C. § 12101(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

42 U.S.C. § 12102(2)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Pursuant to Federal Rule of Civil Procedure 56, Local Rules 7 and 56, and Federal Rule of Civil Procedure 15(a), the Defendant, Connecticut Container Corporation ("Connecticut Container" or the "Company"), hereby respectfully submits this Memorandum of Law in Support of its Motion for Summary Judgment, requesting that this Court dismiss the Complaint of Anthony Willoughby ("Plaintiff" or "Willoughby") in its entirety and, to the extent necessary, allow the Company leave to amend its Answer to add an affirmative defense barring Plaintiff's tort claims under the exclusivity provisions of the Workers' Compensation laws.

### INTRODUCTORY STATEMENT AND SUMMARY ARGUMENT

Plaintiff, presently employed by Connecticut Container, filed this action in which he asserts the following causes of action: (1) disability discrimination (i.e., termination) in violation of the Americans with Disabilities Act, codified as 42 U.S.C. § 12101 *et seq.* ("ADA"); (2) failure to accommodate under the ADA; (3) retaliation in violation of the ADA; (4) disability discrimination (i.e., termination) in violation of the Connecticut Fair Employment Practices Act, Conn.Gen.Stat. 46a-60 *et seq.* ("CFEPA"); (5) retaliation in violation of CFEPA; (6) supplemental common law tort claim of intentional infliction of emotional distress; (7) supplemental common law tort claim of negligent infliction of emotional distress; and (8) violation of the Family Medical Leave Act ("FMLA").[1]

Connecticut Container is a manufacturer of corrugated packaging solutions located in North Haven, Connecticut. Willoughby was and is employed by Connecticut Container as an operator of one of its machines (i.e., baler operator). Willoughby's Complaint stems from the fact that the Company terminated his employment[2] after it found him shortly after midnight on

---

[1] It is unclear whether Plaintiff is proceeding under state or federal FMLA. Either way, Plaintiff's claim should be dismissed.

[2] Willoughby was terminated on August 27, 2009 and was brought back to work on May 10, 2010, without back pay, pursuant to a Settlement Agreement between Willoughby's Union, Willoughby and Connecticut Container.

August 21, 2009, outside the plant[3] on a loading dock sleeping in a chair against a wall next to propane tanks. The central premise of Willoughby's claims is that he had not fallen asleep, but rather had "passed out" due to his diabetes, and that it was because of his diabetes that the Company discriminated against him, retaliated against him and failed to accommodate him; interfered with his FMLA rights; and inflicted emotional distress (both negligently and intentionally). However, simply put, Willoughby's legal theories, and the weak and specious allegations that support them, fall woefully short of establishing causes of action that are capable of surviving summary judgment.

## A.   ADA Claims

All of Willoughby's disability discrimination and retaliation claims under the ADA must be dismissed because Plaintiff cannot establish he was disabled within the meaning of the ADA. As a matter of law, a plaintiff asserting an ADA disability claim must: (i) establish he suffers from a physical or mental impairment; (ii) identify the major life activity claimed to be impaired; and (iii) show that his impairment substantially limits the particular major life activity.[4] And, particularly critical, in order to establish a *prima facie* case under the ADA, all three of these threshold factors must be proven by competent probative medical evidence.[5]

---

[3] Willoughby operated a machine inside the Connecticut Container plant and would have no reason, in the ordinary course, to be outside the building on the loading docks.

[4] *See Buotote v. Illinois Tool Works, Inc.*, 815 F.Supp.2d 549, 556 (D. Conn. 2011) (The determination of whether plaintiff does or does not have a disability covered by the ADA uses a three-step approach...A plaintiff must first show that he suffers from a physical or mental impairment; second, plaintiff must identify the activity claimed to be impaired and establish it constitutes a major life activity; and third, the plaintiff must show his impairment substantially limits the identified major life activity); *see also, Bellamy v. General Dynamics Corp.*, 2012 WL 1987171, at *5 (D. Conn. 2012); *Bragdon v. Abbott*, 524 U.S. 624, 118 S. Ct. 2196, 141 L. Ed.2d 540 (1998).

[5] To establish substantial impairment of a major life activity, Courts in the Second Circuit have mandated plaintiffs to introduce medical evidence substantiating the specific limitations to which he claims he is subject due to his conditions and have found plaintiff's own testimony, as to any limitations, insufficient evidence to establish a *prima facie* case under the ADA. *Mann v. Patrick Donahoe, Postmaster General*, 2012 U.S. Dist. LEXIS 22185 (D. Conn. 2012); *Ragusa v. Malverne Union Free School District*, 381 F. App'x, 85, 88 (2d Cir. 2010); *Ward v. United States Surgical Division of Tyco Healthcare*, 2005 WL 2972974 *10 (D. Conn. 2005); *Farina v. Branford Board of Education*, 2010 WL 3829160 *12 (D. Conn. 2010) (**Second Circuit Courts have consistently held that when a plaintiff fails to offer any medical evidence substantiating the specific limitations to which he claims he is**

2

Here, Plaintiff fails to allege the particular life activity that is substantially impaired (in fact, in both his Complaint and deposition testimony, he fails to identify any particular life activity that is substantially impaired -- he simply relies on the fact that he is a diabetic). Equally fatal to his ADA claims is that he has not submitted any probative medical evidence substantiating the specific limitations to which he claims he is subject to due to his condition.[6] As a result, Willoughby's inability to establish this most basic element under the ADA, namely that he suffers from an impairment substantially limiting a major life activity, should, in and of itself, result in the dismissal of Willoughby's ADA claims in their entirety.

### 1. The ADA Disability Termination Claim

In the event the Court finds Willoughby has a disability within the meaning of the ADA, which it should not, the various claims asserted by Willoughby under the ADA still fail. Plaintiff's claim his employment was terminated because of his diabetes is simply not true. The Company terminated Willoughby's employment for one reason and one reason only -- it found him sleeping on the job. The ultimate decision-maker, the Company's Chief Operating Officer, Executive Vice President and General Manager, is a diabetic himself. Moreover, the two decision makers, the Co-Plant Manager, at the time they made the decision to terminate Willoughby, did not know he even had diabetes. Willoughby submitted an FMLA Form, more than five months prior to being found sleeping on the job, which indicated he had diabetes. However, that Form merely excused an absence from work for one week's time and otherwise <u>fully</u> released him to work without restriction. By no means did the Form identify any restriction on any life activity, at work or otherwise.[7] Because, as a matter of law, companies cannot

---

subject due to his condition, he cannot establish he is disabled within the meaning of the ADA) (emphasis supplied).

[6] The identity of the major life activity Willoughby claims to be substantially limited in, at this point, is a mystery.

[7] See Ragusa, supra, 88 (Affirming summary judgment because no reasonable fact finder could identify the requisite substantial limitation based on the record of a doctor's note clearing plaintiff to return to work following surgery and

disclose the reason behind an FMLA absence (absent a need for an accommodation),[8] and the decision makers were not even aware of Plaintiff's diabetes at the time they made the decision to terminate his employment, Plaintiff's disability termination claim fails.[9]

### 2. The ADA Failure to Accommodate Claim

Plaintiff's claim under the ADA that the Company failed to provide him with an accommodation is baseless in view of the fact that Plaintiff himself testified he never asked for an accommodation, and all of the testimony taken is uniform in that Willoughby never sought an accommodation.  It is beyond cavil that in order to assert a failure to accommodate claim, an employee must first ask for one.[10]  Here, Willoughby never asked for an accommodation.  If he is contending the Company should excuse the fact he was sleeping on the job, _after_ they found him sleeping, that simply is not a reasonable accommodation.[11]  Moreover, any contention that the Company should have initiated some sort of discussion about a reasonable accommodation upon finding him asleep on the job is absurd, as the only medical information the Company had in its file at the time of the incident, and at the time the termination decision was made, was an FMLA Form, submitted more than five months earlier, that fully released him to return to work without restriction.

---

plaintiff's non-specific testimony about his limitations).  Moreover, a serious health condition under the FMLA is not, on its face, tantamount to a disability under the ADA.  _Price v. Mount Sinai Hospital_, 2012 WL 313577 at *12 (2d Cir. 2012).

[8] _See_ C.F.R. § 825.500(g)(1)-(3).

[9] _See Perry v. Department of Correction_, 2012 WL 1108551 (D. Conn. 2012), _citing, Kolivas v. Credit Agricole_, 1996 WL 684167 (S.D.N.Y. 1996), _aff'd_ 125 F.3d 844 (2d Cir. 1997) (Defendant not liable when supervisor had begun termination process before learning of employee's "disability").

[10] To establish a _prima facie_ case for disability discrimination based on failure to accommodate, in addition to showing he is an individual with a disability under the ADA (which he cannot), he has to, among other things, show employer _refused_ to accommodate him.  _Farina, supra_ at *3; _Graves v. Finch_, 457 F.3d 181, 184 (2d Cir. 2006) (Generally, it is the responsibility of the individual with a disability to inform the employer than an accommodation is needed).

[11] _Schneider v. Shah_, 2012 U.S. Dist. LEXIS, 49379, *21 (D.N.J. 2012) (After the fact accommodation requests, which relate to a period when no notice of disability is given, cannot be a reasonable accommodation).

### 3.  **Plaintiff's ADA Retaliation Claim**

Plaintiff's claim that he was retaliated against under the ADA is equally baseless. Plaintiff's retaliation claim is essentially two-fold, namely that the termination of his employment was retaliatory, and then, when he returned to work pursuant to a Settlement Agreement, he was further retaliated against.  As far as his retaliation claim relating to his employment termination, he does not allege or testify that he engaged in any sort of protected activity prior to the termination decision.  Instead, his retaliation claim is premised upon his allegation that the Company terminated him upon receipt of medical documentation purportedly justifying his conduct on the night he fell asleep.  It is the most basic tenet of the law of retaliation that such a premise does not support a retaliation claim -- the activity must be "protected activity."[12]

Plaintiff's claim that he was retaliated against when he returned to work is equally specious, particularly given Plaintiff's own testimony.  Plaintiff does not know why the only two individuals who he claims were retaliating against him ("Walter" and "Orlando") were engaging in that alleged conduct and he never suffered an adverse job action.  Since Willoughby returned to work, he only received one verbal warning for taking a non-scheduled break which, in his words, "was no big deal."  In view of Willoughby's admissions that he does not know why the people were "retaliating" against him (in Willoughby's words, "maybe he doesn't like me" or "you have to ask him why he is doing it"), and that he never suffered any type of adverse job action because of the alleged retaliation, the retaliation claim should be dismissed.

---

[12] *See Rivera v. City of Torrington Board of Education*, 2008 WL 2414306, *5 (D. Conn. 2008).  To state a claim for retaliation under the ADA, a plaintiff must allege that (1) he engaged in protected activity; (2) the employer knew about his participation in a protected activity; (3) an adverse employment action occurred; and (4) there is a causal connection between the adverse employment action and the employee's participation in the protected activity.  The term "protected activity" refers to action taken to protest or oppose statutorily-prohibited discrimination.  *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000).

**B.**    **Plaintiff's CFEPA Claims**

Because Plaintiff's CFEPA's claims are examined in conjunction with the ADA, and the evidentiary standards are the same, Plaintiff's CFEPA's claims should be dismissed for the same reasons as his ADA claims.[13]   Should the Court find that Plaintiff's CFEPA claims survive (which it should not), but the ADA claims do not, this Court would no longer have supplemental jurisdiction over Plaintiff's CFEPA claims.[14] As will be illustrated below, Plaintiff does not have an FMLA claim sufficient to survive summary judgment.

**C.**    **Plaintiff's FMLA Claim**

Plaintiff's FMLA claims should not survive summary judgment for several reasons. First, Plaintiff entered into a Settlement Agreement with Connecticut Container that expressly released the Company from every claim from the beginning of time until his reinstatement, with the exception of his then pending Complaint with the CHRO and his then pending Charge with the EEOC or any litigation arising out of said Charges.[15]   It is clear that Plaintiff's FMLA claim was not and could not have been part of or included in Plaintiff's EEOC Charge or CHRO Charge as neither agency has jurisdiction over FMLA claims.[16]   As such, Plaintiff's FMLA claim, because it was not part of the CHRO or EEOC Charge, should, pursuant to the release language contained in the Settlement Agreement, be dismissed.

---

[13] *Buotote, supra*, *556 (Although the CFEPA applies more broadly than the ADA, the evidentiary standards are the same, and although the CFEPA has no "substantial limitation" requirement, the need for corroborating evidence of disability under the ADA is also required under CFEPA); *Buck v. AT&T Servs., Inc.*, 2010 WL 26440045, *1 n.1 (D. Conn. 2010) (Connecticut Courts generally analyze ADA and CFEPA claims under the same standard).  *Tomick v. United Parcel Service, Inc.*, 135 Conn. App. 589, 612 (2012) (Although claim is based solely on Connecticut law, we review federal precedent concerning employment discrimination for guidance in enforcing our own anti-discrimination statutes).

[14] *Bellamy, supra*, *7 (Court declined to exercise supplemental jurisdiction over plaintiff's CFEPA claim, in a non-diversity case, once federal ADA claim was dismissed on summary judgment; *see also*, 28 U.S.C. § 1367(c)(3) (District Court may decline to exercise supplemental jurisdiction over state law claims where all federal claims are dismissed).

[15] *See* copy of Settlement Agreement (paragraph #7) annexed to Affidavit of Barry Besen as Exhibit E.

[16] The Federal FMLA is within the jurisdiction of the U.S. Department of Labor, not the EEOC, and the Connecticut FMLA is governed by the State Department of Labor.  *See* § 31-5199-43(c) of the regulations of Connecticut State Agencies; *Roberts v. Area Cooperative Educational Services*, 210 Conn. Super. LEXIS 240 (Conn. 2010); *see also* Exhibit 24, excerpts from EEOC website showing it has no jurisdiction over FMLA claims.

Second, in the event the Court does not find the Settlement Agreement to be determinative, Plaintiff's FMLA claim still fails in that he was not entitled to FMLA leave under the circumstances.   One of the *prima facie* elements to asserting an FMLA claim is for the plaintiff to show the employee notified the company of his intention to take FMLA leave and he was denied same.[17]  Nowhere in Plaintiff's deposition testimony, or in the allegations contained in his Complaint, does he contend he gave notice to the Company that he needed FMLA leave. Even in unforeseeable circumstances, a plaintiff must notify his employer, as soon as practicable, of his intention to take FMLA leave.   Because the Plaintiff, as a matter of undisputed fact, never provided notice (or pled he provided notice) to his employer of his need to take FMLA leave, the FMLA claim should be dismissed.[18]

Third, it is not clear from Plaintiff's pleadings if he is asserting a federal FMLA claim or state FMLA claim.   If he is asserting a state FMLA claim, it should likewise be dismissed, in addition to the reasons set forth above for the dismissal of the federal FMLA claim, because he failed to exhaust his administrative remedies by filing with the Connecticut Department of Labor, therefore depriving this Court of subject matter jurisdiction over any state FMLA claim.[19]

**D.    Plaintiff's Intentional Infliction of Emotional Distress Claim**

Plaintiff's intentional infliction of emotional distress claim ("IIED") should be dismissed for essentially five reasons.   First, this type of tort claim was released under the Settlement Agreement discussed above (tort claims of this nature plainly are not within the jurisdiction of the EEOC or CHRO, and thus were not preserved as part of the Settlement Agreement).   Second, the mere termination of Plaintiff's employment, which is the primary basis for Plaintiff's IIED

---

[17] *Dicara v. Connecticut Rivers Council*, 663 F.Supp.2d 85, 95 (D. Conn. 2009) (To assert *prima facie* case for a FMLA interference claim, plaintiff needs to show he gave notice of plan to take leave and that he was denied benefits).

[18] Indeed, the next time Plaintiff provided the employer with FMLA paperwork was almost two years after the 2009 incident, in June 2011.  Exhibit 3, Willoughby Dep., Exhibit J.

[19] *Roberts, supra*, (Court has no subject matter jurisdiction as plaintiff failed to exhaust his administrative remedies).

claim, is simply not enough, on its face, to meet the exceedingly high standard to establish a *prima facie* intentional infliction of emotional distress claim.[20]   Third, in order to establish an IIED claim, Plaintiff must prove he has suffered severe emotional distress.   The record is completely void of any evidence that Plaintiff suffered from severe emotional distress.[21]   Fourth, should the Court dismiss Plaintiff's federal ADA (and FMLA) claims, the Court should not exercise its supplemental jurisdiction over the state law claims.   Fifth, to the extent Plaintiff seeks recovery for physical injury from emotional distress, which he has pled in his Complaint, recovery would be barred by the exclusivity provision of the Connecticut Workers' Compensation Act ("WCA").[22]

Although the Company has not pled the Workers' Compensation bar as an affirmative defense (it is not on the list of defenses that must be pled under Fed. F. Civ. P. 8(c)), to the extent this Court is of the view it should have been enumerated as an affirmative defense, the Company asks this Court, with respect, to construe this motion for summary judgment as also a motion for leave to amend its Answer to assert the Workers' Compensation bar as an affirmative defense.[23]

**E.     Plaintiff's Negligent Infliction of Emotional Distress Claim**

Plaintiff's negligent infliction of emotional distress claim should be dismissed for essentially the same reasons as the intentional infliction of emotional distress claim.

---

[20] *Cyrus v. Papa's Dodge, Inc.*, 2012 U.S. Dist. LEXIS 42618 (D. Conn. 2012) (Mere termination of employment is usually insufficient to satisfy the extreme and outrageous standard for a claim of intentional infliction of emotional distress).

[21] *Wells v. Plainfield*, 2005 Conn. Super. LEXIS 65 (Jan. 11, 2005).

[22] *See* C.G.S. § 31-284(a); *Gregory v. Southern New England Telephone Co.*, 896 F.Supp. 78 (D. Conn. 1994) (Plaintiff's claims of intentional infliction of emotion distress are barred under the exclusivity provisions of the WCA; *Conzo v. Aetna Ins. Co.*, 243 Conn. 677, 680-81 (1998) (Workers' Compensation is an employee's only remedy for injuries that arise during the course of his employment when the claim is predicated upon tort).

[23] *Monahan v. N.Y. City Dept. of Corr.*, 214 F.3d 275, 283 (2d Cir. Civ. 2000).

## STATEMENT OF MATERIAL FACTS

Connecticut Container refers the Court to its Local Rule 56.1 Statement of material facts not in dispute, for a full recitation of the factual record.  A brief factual summary is as follows:[24]

Connecticut Container is a Connecticut corporation located at 455 Sackett Point Road in North Haven, Connecticut.   Connecticut Container is in the business of manufacturing corrugated boxes, where it currently employs, including the Plaintiff, approximately 106 employees.  [56.1 ¶¶ 1-3.]  Willoughby was hired by Connecticut Container in or around 1978, with his most recent position being a baler operator.   In the position of baler operator, Willoughby's responsibilities include hogging up waste which means gathering the waste that comes off the corrugator machine.  [56.1 ¶¶ 4-5.]  Willoughby also works on the transfer car, which was another one of his responsibilities at Connecticut Container.  [56.1 ¶ 5.]

On or about August 20, 2009, at 10:00 p.m., Willoughby reported to work the third shift, which was his usual shift.  [56.1 ¶ 6.]  Willoughby was found by Darlene Bailey, his Supervisor, sleeping on the job after midnight on August 21, 2009, outside the plant on a loading dock in a chair against a wall next to propane tanks, and, as a result, his employment was terminated. [56.1 ¶¶ 7-8.]

## CONNECTICUT CONTAINER'S KNOWLEDGE OF WILLOUGHBY'S MEDICAL SITUATION PRIOR TO AUGUST 20, 2009

On or around March 11, 2009, more than five months prior to Willoughby being caught sleeping on the job, Plaintiff submitted FMLA paperwork completed by his physician, Suzanne Robinson, M.D.   The FMLA Form was submitted to explain an absence from work from February 27, 2009 to March 7, 2009.   [56.1 ¶¶ 9-11.]   The Form contained the following questions and answers (filled out by Plaintiff's physician):

---

[24] Citation references to "56.1" refers to the Statement of Undisputed Facts Pursuant to Local Rule 56(A)(1) submitted as part of the instant motion.

**Question 5a -** "State the approximate date the condition commenced and the probable duration of the condition (and also the probable duration of the patient's present incapacity if different?"

**Answer to Question 5a -** "He missed work ½ a shift on 2/27/09 and was out of work through 3/7/09.  To return to work on 3/8/09…"

**Question 5b -** "Will it be necessary for the employee to take work only intermittently or to work on less than a full schedule as a result of the condition (including treatment described in item 6 below)?"

**Answer to Question 5b -** "No."

**Question 5c -** "If the condition is a chronic condition (condition #4), or pregnancy, state whether the patient is presently incapacitated and the likely duration and frequency of episodes of incapacity."

**Answer to Question 5c -** "Chronic condition but do not expect episodes of incapacity."

**Question 6a -** "If additional treatments will be required for the condition, provide an estimate of the probable number of such treatment."

**Answer to Question 6a -** "He will continue to be seen for his diabetes but do not expect he will miss work for this."

**Question 6a further asks -** "If the patient will be absent from work or other daily activities because of treatment on an intermittent or par-time basis, also provide an estimate of the probable number of and interval between such treatments, actual or estimated dates of treatment if known, and period required for recover if any."

**Answer to Question 6a -** "N/A."

**Question 7a -** "If medical leave is required for the employee's absence from work because of the employee's own condition (including absences due to chronic condition), is the employee unable to perform work of any kind?"

**Answer to Question 7a -** "No further absence from work expected."

[56.1 ¶¶ 12-23.]

Thus, as of March 11, 2009, Plaintiff was fully released back to work without restriction.

Willoughby admits that there is nothing on this Form that restricts his ability to work, and that

nowhere on this Form does it indicate that Plaintiff's condition would have any impact on his work performance; that Plaintiff will need to sleep on the job; or that Plaintiff may be prone to dizziness, falling asleep or passing out. [56.1 ¶¶ 24-27.] Indeed, between March 11, 2009 when the FMLA Form was submitted, and August 20/21, 2009, when the incident occurred that led to the termination of Plaintiff's employment (a period of more than five months), Plaintiff submitted no further medical documentation to the Company regarding any restrictions he might have in the workplace, and there is, and was, nothing in Plaintiff's personal medical file maintained by the Company that gave any indication he had any limitations, at work or otherwise, due to his diabetes. [56.1 ¶¶ 28-30.]

Because, pursuant to law, Human Resources personnel at Connecticut Container, namely Deborah Delgado, would not disclose the reason for a particular medical leave of absence (FMLA or otherwise), neither Barry Besen, the Company's COO who is himself a diabetic, and the ultimate decision-maker regarding Plaintiff's termination, nor Walter Vazquez and Michael Deubel, the Co-Plant Managers who made the decision to terminate Plaintiff, had any knowledge, prior to the decision to terminate Willoughby's employment, that he had diabetes. [56.1 ¶¶ 41-42.]   Even if the Company's Human Resources personnel had knowledge of Willoughby's diabetes, she had no knowledge of any restrictions or potential impediments in the workplace, as there were none.  [56.1 ¶¶31, 44-46.]  Moreover, just as with the management involved in the decision to terminate Willoughby, the supervisor who found Willoughby sleeping on the night in question, Darlene Bailey, similarly had no knowledge Willoughby had diabetes. [56.1 ¶¶ 32-35.]

**PLAINTIFF'S MEDICAL CONDITION ON OR AROUND AUGUST 21, 2009,
MORE THAN FIVE MONTHS AFTER HE SUBMITTED HIS FMLA FORM[25]**

Willoughby testified regarding his physical condition on or around August 21, 2009, the

date when he was found sleeping on the job, that:

- Other than having some difficulties working on the transfer car, his diabetes did not limit any of his other daily activities;

- He had no problems talking, breathing or learning;

- His vision fluctuated and then it stopped after about a week;

- His problem walking consisted of the fact he had to work with a limp. The limp lasted about a week and a half;

- Other than working on the transfer car (which he was still able to do, and which was just one of his many responsibilities at Connecticut Container), he had no problems performing manual tasks;

- Other than the August 20th incident, his diabetes did not cause him any other problems at work;

- The swelling in his ankles impacted his ability to do his job on some occasions, in which case he would sit down, which the Company was fine with him doing;

- He had a scratchy throat and was nauseous, but had no problems working, and did not tell the Company about it;

- He took his medications everyday and his general activities were not limited.

[56.1 ¶¶ 49-61; 64-66.]

Notwithstanding that Willoughby testified he takes and took his medications every day,

he testified that:

- If he did not take his medications, it would cause him to sweat, give him a sore throat, get dizzy, and cause him to swell; and could cause him to go to the bathroom frequently and cause him to be incoherent;

---

[25] The law is clear that it is the plaintiff's medical condition at the time of the alleged adverse action that is probative in terms of determining whether a plaintiff has a disability within the meaning of the ADA. *Cousins v. Howell Corporation*, 113 F.Supp.2d 262, 270 (D. Conn. 2000).

- Some of the symptoms of his diabetes are sore throat, dizziness, swelling, and his vision comes and goes and gets blurry.  There are no other activities, other than those activities mentioned in the preceding sentence, that limit his daily life with or without medication;

- The blurred vision stopped after about a week.

[56.1 ¶¶ 67-70.]

It is plain, according to Willoughby's own deposition testimony, that he does not identify any life activity, even under questioning from his own counsel, that was impaired, substantially or otherwise, as a result of his diabetes.  Moreover, nowhere within his Complaint does he allege his diabetes substantially limited a major life activity and he does not submit any expert medical testimony identifying the major life activity that is being impacted by his diabetes.  [56.1 ¶¶ 63, 74, 75, 219.]

### THE INCIDENT OF AUGUST 21, 2009

In August 2009, Darlene Bailey was the Second Shift Supervisor, and her hours overlapping with the third shift, which was Willoughby's shift.[26]  [56.1 ¶¶ 76-79.]  During the evening of August 20, 2009, Ms. Bailey was in need of assistance from Willoughby to bring material to the machines.  [56.1 ¶¶ 79-80.]

Ms. Bailey started to page Willoughby, and when she could not locate him, she began searching the plant.  She eventually went outside to the loading docks and found that Willoughby had taken a chair, set it alongside the propane tanks, and fallen asleep.  [56.1 ¶¶ 81, 85, 86, 87.]  Ms. Bailey stood close to him, and when Willoughby did not respond to his name was called, Ms. Bailey shook his arm, and Willoughby then jumped up and apologized.  [56.1 ¶ 81.]  Ms. Bailey then, exercising her role as his Supervisor, advised Willoughby he should not be out there sleeping, sent him home for the evening and told him they would handle this issue on Monday

---

[26] Ms. Bailey was terminated from the Company when her position was eliminated in December 2009.

(his next scheduled workday).  [56.1 ¶ 81.]  Ms. Bailey then contacted the Union representative

to let them know what was going on.  [56.1 ¶ 217.]  However, Willoughby would not stay.  [56.1

¶ 216.]  Willoughby was "hell bent" on leaving -- he walked down the steps and over to the side

of the building where he always parked his car.  [56.1 ¶ 218.]  In the ordinary course, Plaintiff's

responsibilities as a baler operator or transfer car operator would not require him, during his shift

in the middle of the night, to go out to the loading dock, which is outside the building and several

hundred feet away from where he would ordinarily be located.  [56.1 ¶ 84.]  While Willoughby

claims he was directing a truck driver to the loading dock to unload his truck, neither Ms. Bailey

nor the Company's engineer who reviewed the videotape from that evening saw any trucks on

the loading docks.  [56.1 ¶¶ 89, 115.]

### THE DAYS FOLLOWING THE INCIDENT OF AUGUST 21, 2009

On the morning of August 21, 2009, Walter Vazquez, the Co-Plant Manager on duty on

the first shift, walked into work to find a note from Darlene Bailey explaining what had

transpired with Willoughby the night before.  [56.1 ¶ 92.]  After reviewing the note, Mr.

Vazquez conferred with Co-Plant Manager, Michael Deubel, and they agreed Mr. Vazquez

would speak with Ms. Bailey to go over the events of the previous night when she arrived at

work for the second shift.  [56.1 ¶ 94.]

Mr. Vazquez, after speaking with Ms. Bailey, who reiterated the events of the night

before,[27] walked outside to see the area outside the building where she found Willoughby --

outside on the docks next to the propane tanks.  [56.1 ¶ 98.]  Upon inquiring further into the

circumstances of the early morning hours of August 21, 2009, Mr. Vazquez and Mr. Deubel

---

[27] Ms. Bailey advised Mr. Vazquez that she sent Willoughby home because we cannot have employees sleeping on the job. [56.1 ¶ 96.]

reconvened and agreed, with the approval of Barry Besen, to terminate Willoughby's employment. [56.1 ¶ 100.]

At the time they decided to terminate Willoughby, neither Messrs. Besen, Deubel or Vazquez, who were the decision makers, had any knowledge Willoughby had diabetes. [56.1 ¶ 101.] The only knowledge Messrs. Besen, Deubel and Vazquez had regarding Willoughby's medical condition was that he returned to work from FMLA more than five months earlier, without any restriction. [56.1 ¶ 102.] They had no knowledge of the underlying condition, as they were prohibited, as a matter of law, from knowing, and Deborah Delgado, the Human Resources Manager never told them. [56.1 ¶ 102.]

Willoughby was terminated on August 27, 2009, when Mr. Vazquez called him to advise his employment was being terminated for sleeping on the job. [56.1 ¶ 104.] To reiterate, at the time, the only medical documentation the Company had on file relating to his diabetes was the 2009 FMLA Form. [56.1 ¶¶ 28-29.]

Because Willoughby is a Union member, there was a grievance process in place to contest the termination of his employment. [56.1 ¶ 104.] The first post-termination meeting that took place pursuant to the grievance process was the third-step meeting on September 1, 2009, which was the first time Willoughby presented any of the decision-makers with medical documentation attempting to excuse his conduct on the night of August 21, 2009, by linking it to his diabetes. [56.1 ¶ 105.][28] The first medical note presented at the meeting was dated August 21, 2009 (the day of the incident), and made no mention of diabetes, indicating merely acute illness/dehydration. [56.1 ¶ 106.] The second note presented was dated August 31, 2009, ten days after the incident, and was by no means conclusive that Willoughby had passed out ten

---

[28] In attendance in this meeting were Michael Deubel, Walter Vazquez, James Streeter, who was Union Steward and Franklin Hernandez, who was also from the Union. [56.1 ¶ 110.]

days prior due to his diabetes, indicating it is believed he passed out due to low blood sugar. [56.1 ¶¶ 107, 113.] The third note presented was also dated August 31, 2009, and was a medical prescription for Norvasc. [56.1 ¶ 108.]

Following the third-step meeting, Mr. Deubel and Mr. Vazquez stood by their decision to terminate Willoughby's employment. [56.1 ¶ 112.] Their decision had nothing to do with Willoughby's diabetes and everything to do with the fact he was found on a chair on the loading dock, in the middle of the night, out of sight next to a propane tank, several hundred feet away from where he should have been working; he was not medically evaluated for his diabetes until ten days after the incident; the medical documentation of the August 31 evaluation was not conclusive; and they did not find Willoughby's explanation that he was directing a truck driver to the loading dock at that hour very plausible. [56.1 ¶¶ 112-116.][29]

Following as part of the grievance process the third-step meeting, Barry Besen, the Company's Chief Operating Officer, Executive Vice President and General Manager, conducted the fourth-step meeting. [56.1 ¶ 117.] Mr. Besen, who has diabetes, having been diagnosed with diabetes approximately four to five years ago, was the final decision maker with regard to Willoughby's termination, and approved the decision made by Mr. Deubel and Mr. Vazquez on August 27, 2009, to terminate Willoughby's employment. [56.1 ¶¶ 119-120.] Mr. Besen's election to sustain the termination had nothing to do with Willoughby's diabetes and everything to do with the reasons expressed by Deubel and Vazquez above. [56.1 ¶¶ 121-127.]

Under the Collective Bargaining Agreement ("CBA") with the Union, sleeping is neither listed as a progressive discipline offense nor as a summary discharge. Neither of these lists is exclusive or otherwise. [56.1 ¶ 128.] Willoughby, as was the case with other employees terminated for sleeping on the job, was terminated pursuant to Article 5 of the CBA which states

---

[29] In the ordinary course, trucks do not arrive after midnight at Connecticut Container. [56.1 ¶ 126.]

an employee can be terminated for proper cause. [56.1 ¶ 129.] **Willoughby testified, agreed and admitted that if he had been hiding and sleeping on the job, that would be a legitimate reason to terminate his employment. [56.1 ¶ 130.]** (Emphasis supplied.) In fact, this was not the first time Willoughby was found sleeping on the job -- Darlene Bailey found Willoughby sleeping at some time prior to the August 20th incident and stated loud and clear to Willoughby, "you know you can't do this on the job. It's going to get you in a lot of trouble." [56.1 ¶ 134.]

As for his claims that the termination of his employment was discriminatory, Willoughby, himself, is not sure of the reason why it was discriminatory. He initially testified his termination was discriminatory based on age and race. [56.1 ¶ 149.] However, Willoughby is not suing for age or race discrimination. [56.1 ¶¶ 149-150.] Willoughby then testified, after some prompting from his counsel, that he was terminated because of his age, race and his diabetes. [56.1 ¶ 151.] He acknowledged that nobody told him he was terminated because of his age and that he assumed race played a part. [56.1 ¶ 152.] Willoughby testified further that other than the termination of his employment, the Company did not take any adverse action against him that was discriminatory. [56.1 ¶ 154.]

## THE ARBITRATION AND SETTLEMENT

Once Willoughby's termination was upheld at the fourth-step meeting, his Union filed for arbitration pursuant to the CBA. [56.1 ¶ 158.] Before commencing the arbitration, the matter was settled pursuant to the terms of a Settlement Agreement. [56.1 ¶ 159.] The Settlement Agreement contained the following pertinent terms:

- Willoughby would be reinstated to his employment, with full pension credit, effective May 10, 2010.

- Willoughby would not receive payment of any kind (pay, benefits, paid time off, etc.) for the period of his termination on August 27, 2009 until the time of his reinstatement on May 10, 2010.

17

- Willoughby released the Company from all claims from the beginning of time until the date of reinstatement except that the release did not include his pending Complaint with the CHRO and his pending Charge with the EEOC or any litigation arising out of said Charges.

[56.1 ¶¶ 160-164.]

The Company, pursuant to the Settlement Agreement, reinstated Willoughby, and he remains employed by the Company to this day.   [56.1 ¶ 163.]   Despite the terms of the Settlement Agreement, Willoughby has brought claims in this lawsuit that were released and not preserved under the Settlement Agreement, namely claims under the FMLA and claims for intentional and negligent infliction of emotional distress.  [56.1 ¶¶ 164-167.]  Willoughby is also seeking back pay, which was also waived pursuant to paragraph 2 of the Settlement Agreement. [56.1 ¶ 161.]

During the course of the instant litigation, in an attempt to justify his claims, Willoughby has pointed to former employee, Thomas Rice, who was also found sleeping on the job but who according to Willoughby was treated differently from Willoughby.  However, Thomas Rice's employment was terminated for sleeping on the job, and he too entered into a non-precedent setting Settlement Agreement following the termination of his employment where he was returned to work -- **without back pay**.  [56.1 ¶¶ 168-169.] (Emphasis supplied.)  Mr. Rice did receive multiple warnings before his employment was terminated, however, in those instances the Company was aware of and in possession of documentation from his physician that he suffered from sleep apnea, a condition which caused him to fall asleep on the job.  [56.1 ¶ 170.] Willoughby, to the contrary, had no such medical information in his files, prior to the August 21, 2009 incident, indicating that he had a condition that would cause him to fall asleep or pass out

on the job. [56.1 ¶ 171.] Moreover, John Rusniak, a Company Supervisor, was summarily terminated without warning for sleeping on the job. [56.1 ¶ 172.][30]

### PLAINTIFF'S REQUEST FOR ACCOMMODATION (OR LACK THEREOF)

Other than submitting the FMLA Form in March 2009, which fully released Willoughby back to work without restriction, Willoughby never asked the Company for a job accommodation prior to August 20, 2009 and has not asked for a job accommodation since returning to work in May, 2010. [56.1 ¶¶ 174-177.] Darlene Bailey, Willoughby's Supervisor, was aware of another employee, Lamont Riley, another diabetic, who was accommodated for frequent bathroom breaks in accordance with a note from a doctor. [56.1 ¶ 180.]

### RETALIATION

Plaintiff claims he was retaliated against when his employment was terminated in August 2009, and again when he returned to work pursuant to the Settlement Agreement in May 2010. [56.1 ¶ 181, 185.] The fact remains Willoughby did not engage in any protected activity prior to the termination and Plaintiff does not plead that he did. [56.1 ¶¶ 182-184.]

Plaintiff's claim that he was retaliated against upon his return to work is based on the fact he was apparently being harassed and followed by Walter Vazquez and Orlando Quintana, who he claims were not his supervisors. However, Plaintiff's own testimony does not support his retaliation claim as he indicated he does not know why Messrs. Vazquez and Quintana were doing what they were doing (maybe they do not like him; maybe it is because of a Union issue that existed between Willoughby and Mr. Vazquez from some time ago; and we have to ask Mr.

---

[30] It is the Company's view that analyzing the circumstances of Mr. Rice and Mr. Rusniak is not relevant to Mr. Willoughby's situation and would just result in mini-trials within a trial, which is something, as a matter of law, the Courts generally avoid. Nevertheless, because Plaintiff has focused on Mr. Rice during discovery, the Company felt it was necessary to bring the circumstances surrounding Mr. Rice to the Court's attention in its moving papers.

Vazquez why he is doing it);[31] and he never suffered an adverse job action (the only thing that occurred was a verbal warning for taking an unauthorized break, which Willoughby admitted was no big deal). [56.1 ¶¶ 185-192; 194-199.]

## FMLA

The premise of Willoughby's FMLA claim is that the Company knew he had a problem, i.e., diabetes, and did not take any action to help him after he submitted the FMLA Form in March 2009. [56.1 ¶ 200.] However, integral to any FMLA claim is that an employee gave notice to his employer of his intention to take FMLA leave and it was denied. Nowhere in Plaintiff's deposition testimony does he contend he gave the Company notice of his intent to take FMLA leave and that it was denied. [56.1 ¶¶ 200-205.] Indeed, the next time (after March 2009) Willoughby provided the Company with notice of his need for FMLA leave was almost two years later in June 2011. [56.1 ¶ 206.] In both instances (March 2009 and June 2011), Willoughby's FMLA leave was granted without issue.

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

The sole basis for Willoughby's intentional infliction of emotional distress claim was the termination of his employment. [56.1 ¶ 207.] He currently does not suffer from emotional distress and when he was out of work, allegedly suffering from emotional distress, he did not see a psychologist or therapist; he was not diagnosed as suffering from mental anguish or emotional distress as a result of his employment of separation from Connecticut Container; he was not treated at any medical facility for mental anguish or emotional distress; and he was not taking any prescription drugs for emotional distress [56.1 ¶¶ 207-212.]

---

[31] Willoughby's failure to testify that the reason for the alleged actions of Walter and Orlando were based on protected activity is fatal to his retaliation claim. Even if Walter had any feeling of animus towards Plaintiff (which he does not), that does not mean, under any view, that he retaliated against him.

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

The basis for Willoughby's negligent infliction of emotional distress claim is his claim that he was not given due process and that the Company should not have terminated his employment because it contended he was sleeping. [56.1 ¶ 213.] Willoughby testified that he should have been offered help on the night in question as he should have been escorted to his Union representative to find out what was going on. [56.1 ¶ 214.] When Willoughby asked if there was anything else upon which he bases his negligent infliction of emotional distress claim, he testified, "just that there." [56.1 ¶ 215.]

Contrary to his claim, Darlene Bailey, the Supervisor who found him sleeping on the night in question, contacted the Union representative to let him know what was going on, but Willoughby simply left work without waiting. [56.1 ¶ 217.] She indicated that Willoughby would not stay -- he was "hell bent" on walking down the steps and leaving. ("Willoughby would always park his car over to the side of the building and he was leaving and he was hell bent on that."). [56.1 ¶ 218.]

## LEGAL ARGUMENT

### I.   SUMMARY JUDGMENT STANDARD

A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any" demonstrate the absence of a genuine issue of material fact. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Carone v. Mascolo*, No. 3:06 CV 1094, 2008 U.S. Dist. LEXIS, 60771 (D. Conn., Aug. 7, 2008). Where a motion for summary judgment is made against one who bears the burden of proof at trial, the movant's burden is satisfied if it can point to an absence of evidence to support an essential element of the non-moving party's claim. *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995). Moreover, "a complete failure

21

of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 372-23; *Jancewicz v. SNET Co.*, 54 F.Supp.2d 134, 135 (D. Conn. 1999). "[M]ere assertions of fact are insufficient to establish the existence of an issue of material fact and, therefore, cannot refute evidence properly presented to the Court..." *Miller*, 233 Conn. at 745 (internal brackets omitted). The non-moving party "must substantiate its adverse claim by showing that there is a genuine issue of material fact together with the evidence disclosing the existence of an issue." *Scinto v. Stamm*, 224 Conn. 524, 520 (1993).[32]

This standard is equally appropriate in discrimination cases "to dispose of unmeritorious claims." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002). Indeed, the "salutary purpose of summary judgment -- avoiding protracted, expensive and harassing trials -- applies no less to discrimination cases than to...other areas of litigation." *Weinstock v. Columbia Univ.*, 724 F.3d 33, 41 (2d Cir. 2000) (*quoting Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985); *Agostinello v. Great Neck Union Free School District*, 2009 WL 238865 (E.D.N.Y. 2009).[33]

## II. PLAINTIFF'S CLAIMS UNDER THE ADA ARE WITHOUT MERIT

Claims under the ADA are examined under the burden shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). A plaintiff has the initial burden to establish a *prima facie* case of disability discrimination. *Id.* If plaintiff meets the initial burden, the burden shifts to the employer to offer a legitimate, non-discriminatory reason for its actions. The plaintiff must then offer admissible evidence to rebut the employer's proffered reason -- plaintiff's evidence must prove that the employer's "adverse employment decision more likely

---

[32] The non-moving party must provide "concrete evidence" upon which a reasonable juror could return a verdict in his or her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); A summary judgment motion will not be defeated merely...on the basis of conjecture or surmise. *Bernard v. N.Y. City Health and Hosps. Corp.*, 1996 WL 457284, at *7 (S.D.N.Y. 1996), *quoting Goenaga*, 51 F.3d at 18. "[T]he mere verification by affidavit of one's own conclusory allegations is not sufficient to oppose a motion for summary judgment." *Reed v. State*, 2001 WL 335838, at *4 (D. Conn. 2001).

[33] *Earl v. Wyeth, Inc.*, 603 F.Supp.2d 556, 573 (S.D.N.Y. 2009) ("even in the discrimination context, a plaintiff must prove more than conclusory allegations of discrimination to defeat a motion for summary judgment").

than not was motivated in whole or in part by discriminatory reasons." *Id.* at *9. "[I]t is not sufficient for the fact-finder to disbelieve the employer's explanation; rather, the fact-finder must believe the plaintiff's explanation of intentional discrimination," reasonably supported by the evidence. *Lugo v. Shinseki*, 2010 WL 1993065, at *7 (S.D.N.Y. 2010).

To establish a *prima facie* case under the ADA, Plaintiff must show that "(1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered an adverse employment action because of his disability." *Farina v. Branford Bd. of Education*, 2010 WL 3829160 (D. Conn. 2010).[34]

## A.    Plaintiff Was Not Disabled Under the ADA

A person is disabled within the meaning of the ADA if he has: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) [is] regarded as having such an impairment." 42 U.S.C. § 12101(1).  Major life activities "include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating and working." 42 U.S.C.§ 12101(2)(A).  Major life activity may also include "the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." 42 U.S.C. § 12102(2)(B).

---

[34] The Company does not contest that it is subject to the ADA (prong 1) or that Plaintiff was qualified to perform the essential functions of his job with or without a reasonable accommodation (prong 2).

The determination of whether Plaintiff does or does not have a disability covered by the ADA uses a three-step approach outlined in *Bragdon v. Abbott*, 524 U.S. 624, 118 S. Ct. 2196, 141 L. Ed.2d 540 (1998).  Under this approach,

> A plaintiff must first show that he suffers from a physical or mental impairment;…second, plaintiff must identify the activity claimed to be impaired and establish that it constitutes a major life activity;…and [t]hird, the plaintiff must show his impairment "substantially limits" the identified major life activity.

*Buotote v. Illinois Tool Works, Inc.*, 815 F.Supp.2d 549, 556 (D. Conn. 2011); *Bellamy v. General Dynamics Corp.*, 2012 WL 198171, *5 (D. Conn. 2012).

Critically, particularly in the instant case, the law in the Second Circuit is clear and pronounced that in order to establish a *prima facie* case under the ADA, the above three threshold factors must be proven by competent probative medical evidence and that in ADA cases, the plaintiff's own testimony, as to any limitations, is **insufficient evidence** to establish a *prima facie* case under the ADA.  *Mann v. Patrick Donahoe, Postmaster General*, 2012 U.S. Dist. LEXIS 22185 (D. Conn. 2012) **(To establish substantial impairment of major life activity, Courts in the Second Circuit have mandated plaintiffs to introduce medical evidence substantiating the specific limitations to which he claims he is subject due to his conditions);** ***Ragusa v. Malverne Union Free School District*, 381 F. App'x, 85, 88 (2d Cir. 2010);** ***Ward v. United States Surgical Division of Tyco Healthcare*, 2005 WL 2972974, *10 (D. Conn. 2005) (As a matter of Second Circuit law, without medical evidence substantiating the specific limitations at issue, a plaintiff cannot establish he is disabled within the meaning of the ADA)** (emphasis supplied).

Moreover, the fact Plaintiff had diabetes, in March 2009, which may be sufficient to be considered a serious health condition under the FMLA, is not, on its face, tantamount to a disability under the ADA, and even more so in the instant case, where there is no mention

whatsoever of any restrictions associated with his diabetes. *Price v. Mount Sinai Hospital*, 2012 WL 313577, *12 (2d Cir. 2012); *Kramer v. Hickey-Freeman*, 142 F.Supp.2d 555, 560 (S.D.N.Y. 2001); *Hopkinson v. Peninsula Hospital Center*, 2010 WL 5067702 (E.D.N.Y. 2010) (Evidence overwhelmingly supports company's stated reason for termination (sleeping on the job) and diabetes was not disability under ADA); *Thompson v. USL Unico Service Company*, 750 F.Supp.2d 907, (W.D. Tennessee 2010) (Employee's insulin-dependent diabetes did not render him disabled under ADA); *Carreras v. Sajo, Garcia and Partner*, 596 F.3d 25 (1st Cir. 2010) (Employee's diabetes did not substantially limit his vision, as would establish disability within meaning of ADA).[35]

It is plain that as part of Plaintiff's *prima facie* case, Plaintiff must show that he was disabled, as that phrase is defined by the ADA, at the time of the adverse job action (in this case, on or around August 27, 2009). *Cousins vs. Howell Corporation*, 113 F.Supp.2d 262, 270 (D. Conn. 2000); *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69 (2d Cir. 2000). And the decision as to whether a plaintiff is disabled under the ADA is a question of law for the Court, not a question of fact for the jury. *Hooven-Lewis v. Caldera*, 249 F.3d 259, 268 (4th Cir. 2001); *Bragdon, supra*.

In the instant case, Plaintiff fails to submit any competent evidence identifying the particular life activity he claims to be impaired for purposes of establishing he is disabled within the meaning of the ADA -- instead, he merely relies on the fact he is a diabetic. Nowhere in his Complaint does he identify a major life activity he contends is substantially impaired [56.1 ¶ 63, Compl., Count One] and nowhere in his deposition testimony does he identify the major life activity that was substantially impaired. In point of fact, Willoughby testified, point blank, after questions from his counsel, that his symptoms of diabetes are sore throat, dizziness, swelling,

---

[35] The case law does vary with respect to diabetic conditions being a disability under the ADA. *Grosso v. UPMC and Biotronics*, 2012 WL 787481, at *11 (W.D.Pa. 2012). Here, however, as discussed, *supra* and *infra*, Plaintiff fails to establish his diabetes is tantamount to a disability under the ADA.

and his vision comes and goes and gets blurry, and that there are no other activities that limit his daily life with or without medication. [56.1 ¶¶ 67-70.]

Further, putting the nail in the proverbial coffin on Plaintiff's ADA claim, he fails to produce any medical expert testimony substantiating or identifying the specific limitation to which he claims (whatever that may be) he is subject to due to his condition. Absent such testimony, Plaintiff is unable to offer any proof, in a form admissible at trial, of the specific limitation he was suffering from in August 2009. [56.1 ¶ 219.][36]

**B.     The Company Terminated Plaintiff for a Legitimate Non-Discriminatory Reason and Plaintiff Cannot Establish Pretext for Discrimination**

Notwithstanding Plaintiff's inability to establish a *prima facie* case, if this Court should find that Plaintiff is disabled for the purposes of this Motion, Plaintiff's claim still fails as the Company has articulated a legitimate non-discriminatory reason for terminating his employment. In accordance with the burden of proof in ADA cases, *supra*, once defendant has articulated by competent evidence legitimate, non-discriminatory business reasons for the subject adverse employment decision, plaintiff can defeat summary judgment only by showing defendant's stated reasons were mere pretext, and that the real reason his employment was terminated was intentional discrimination based on his disability. *Heilweil v. Mount Sinai Hospital*, 32 F.3d 718, 722 (2d Cir. 1994). Indeed, an employer need not prove that its legitimate, non-discriminatory business decisions were "a matter of sound business judgment"; the employer need only demonstrate that its decisions were not motivated by discrimination. *See Meiri v. Dacon*, 759 F.2d 989, 995 (2d Cir. 1985), *cert. denied*, 474 U.S. 829 (1985).

As the record amply demonstrates, Plaintiff was terminated for one reason and one reason only -- sleeping on the job -- clearly, by all accounts, a legitimate reason to terminate

---

[36] Because Plaintiff does not allege an ADA violation on the basis he was regarded as being disabled or because of a record of impairment, the Company will not address those issues in this Memorandum of Law.

Willoughby's employment. Even Willoughby, himself, conceded that was legitimate reason to terminate his employment. [56.1 ¶ 130.] There is no dispute that Willoughby was found sleeping in a chair, outside the plant, against the wall next to the propane tanks. [56.1 ¶¶ 81-90.]

Moreover, the only medical information the Company had on file regarding his diabetes at the time the termination decision was made, was his FMLA Form from more than five months prior, which fully released him to return to work and which was not disclosed to his supervisor, the Co-Plant Managers, or the Chief Operating Officer of the Company, pursuant to Company practice, in accordance with the law.[37] *See* C.F.R. § 825.500(g)(1-(3). Even if the Form was disclosed, it still would not have put the Company on notice of any restrictions as it was completely void of any such information. *See Ragusa, supra*, 88 (Affirming summary judgment because no reasonable finder of fact could identify the requisite substantial limitation based on the record of a doctor's note clearing Plaintiff to return to work following surgery and Plaintiff's non-specific testimony about his limitations). To that end, an employer's knowledge of an employee's limitations or symptoms does not provide proof that the employer knew that the condition or symptoms were debilitating. *Brown v. State of Connecticut*, 2010 WL 2220580, *17 (D. Conn. 2010); *Kolivas, supra* (employer's knowledge that plaintiff had just seen a psychiatrist, had been prescribed medication, was depressed and needed a week off from work was insufficient to alert employer that plaintiff was disabled). And the law is well-settled, including in the very recent case of *Perry v. Department of Correction, supra* (where Plaintiff was terminated for sleeping on the job), that when the termination process was started prior to

---

[37] Willoughby attempted to buttress his case through the testimony of his brother (and Union Steward, James Streeter). However, Mr. Streeter's testimony, as far as the termination process is concerned, is useless as he testified he does not know when the post-termination meetings took place and does not know when or which medical documents were presented. [56.1 ¶¶ 136-139.]

any of the decision-makers having any knowledge of the employee's disability, there simply can be no liability.[38]   *See also, Kolivas, supra.*

Thus, at most, the only medical information at the Company's disposal was the FMLA form from five months prior, which on its face, did not and does not put the Company on notice that he was disabled.  But more importantly, the undisputed fact is that the supervisors involved in the termination decision had no knowledge of the medical basis behind Willoughby's FMLA leave five months prior to the incident -- the only information they had at the time the decision to terminate was made was that Willoughby had previously returned to work without restriction.  Moreover, Barry Besen, the COO of this Company, and ultimate decision-maker, is a diabetic himself -- it simply defies logic for Mr. Besen, of all people, to intentionally discriminate against Plaintiff because of his diabetes.  Consequently, for the reasons discussed herein, Plaintiff fails in satisfying his burden of showing pretext.

**C.     Plaintiff's Failure to Accommodate Claim Must Be Dismissed Because Plaintiff did Not Ask for an Accommodation and There Was No Obvious Reason to Provide an Accommodation**

Since Plaintiff has not established that he is disabled under the ADA, the Company owed no duty to Plaintiff to accommodate him.   *Graves v. Finch*, 457 F.3d 181 (2d Cir. 2006). *Busiede v. Providence Health Sys-Oregon*, 2006 WL 3827460 (D. Ore. 2006).  However, should the Court conclude Plaintiff is disabled under the ADA -- which the Company does not concede -- the undisputed material facts show that Plaintiff never asked for an accommodation and it was obvious to no one that he needed one.

To establish a *prima facie* case for disability discrimination based on failure to accommodate, in addition to showing he is an individual covered under the ADA (which he cannot), Plaintiff has to, among other things, show the employer refused to accommodate him.

---

[38] As in *Perry*, Willoughby's FMLA Form certainly has no indication he was prone to losing consciousness.

*Farina, supra,* at \*3.  It is the responsibility of the employee with a disability to inform the employer that an accommodation is needed.  *Brady v. Wal-Mart Stores,* 531 F.3d 127, 135 (2d Cir. 2008); *Nixon-Tinkelman v. New York City Dep't of Health and Mental Hygiene,* 2011 U.S. App. LEXIS 16569 at \*5 (2d Cir. 2011).  The employer also may have an obligation to accommodate an employee's disability if the disability is obvious.  *Brady, supra,* at 135.

Here, the testimony adduced from Willoughby and every other individual who was either deposed or submitted an affidavit in this case, makes it clear Willoughby never asked for an accommodation.  [56.1 ¶¶ 174-180.]  Plainly, a company cannot deny an accommodation if one was never requested.  Likewise, as discussed *supra,* neither the Company nor its supervisors were aware Plaintiff had a disability and medical documentation provided to the Company at the time was plainly insufficient, as a matter of law, to put anyone on notice that he had a disability.  *See Brown* and *Kolivas, supra.*

**D.**      **Plaintiff's Retaliation Claim Under the ADA Must Fail Because He Either Did Not Engage in Protected Activity or Suffer From an Adverse Job Action**

To state a claim for retaliation under the ADA, a plaintiff must allege (1) he engaged in a protected activity; (2) the employer knew about his participation in a protected activity; (3) an adverse employment action occurred; and (4) there is a causal connection between the adverse employment action and the employee's participation in the protected activity.  *Rivera v. City of Torrington Board of Education,* 2008 WL 2414306 at \*5 (D. Conn. 2008).  Plaintiff's retaliation claim consists of two facts.  First, he claims his termination in August 2009 was retaliatory and, second, he claims when he returned to work pursuant to a Settlement Agreement in May 2010, he was further retaliated against.

### 1. Plaintiff's Retaliation Claim Regarding His Termination

Plaintiff's claim relative to his termination must fail because he does not allege he engaged in a protected activity prior to his termination.   The anti-retaliation provisions under the ADA provide "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this act or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this act."   42 U.S.C. 12203.   "The objective of this section is obviously to forbid an employer from retaliating against an employee because of the latter's opposition to an unlawful employment practice."   *Goldieri-Ambrosini v. National Realty and Development*, 136 F.3d 276 (2d Cir. 1998).

Plaintiff, rather than allege he engaged in a protected activity prior to his termination, alleges the Company terminated him upon receipt of medical documentation, after the fact, purportedly justifying his conduct on the night he fell asleep.   [56.1 ¶ 184.]   The medical documentation, which is flimsy at best, was presented after his employment was terminated, was far from conclusive and, in any event, even under the most indulgent review, cannot be characterized as protected activity.

### 2. Plaintiff's Retaliation Claim After His Return to Employment

As the factual record makes abundantly clear, based largely on the admissions contained in Plaintiff's own deposition testimony, Plaintiff cannot establish a retaliation claim since he returned to work in May 2010.   First, Plaintiff identifies two individuals (Walter Vazquez and Orlando Quintana) who he claims retaliated against him, yet Plaintiff has no idea why they are engaging in conduct towards him, and he certainly does not point to the fact he engaged in protected activity.   In fact, when Willoughby was asked what he felt he did to cause the

Company to retaliate against him, he testified, "nothing" [as opposed to engaging in a protected activity]. [56.1 ¶ 186.] Willoughby further testified:

> Q. So you don't feel you did anything, took any action that caused the Company to retaliate against you.

> A. No. They just did it at their own free will.

[56.1 ¶ 187.] This testimony is certainly a far cry from alleging he was retaliated against because he engaged in a protected activity. Willoughby further testified with respect to Mr. Vazquez, that perhaps he retaliated against him because he does not like him, because of his color or because he had a vendetta against him from working in the Union ten years. When Willoughby was asked why Orlando Quintana was retaliating, he testified, "you have to ask Orlando that" as Willoughby does not know why Mr. Quintana was retaliating against him. [56.1 ¶¶ 188-190; 195-198.] Based on the foregoing testimony, Willoughby cannot establish a retaliation claim as he simply cannot, by his own admission, link Messrs. Vazquez and Quintana to any type of protected activity.

Lastly, even if Plaintiff could link the actions of Messrs. Vazquez and Quintana, since he returned to work, to a protected activity, the claim would still fail because he never suffered an adverse job action. The most that he received was a verbal warning, which by Willoughby's own account, "was no big deal" and other than the verbal warning mentioned above, nothing else happened to Willoughby as a result of the alleged acts of retaliation. [56.1 ¶¶ 191-192.] Plaintiff's retaliation claim, since he returned to work, without an adverse job action, should be dismissed.

### III. PLAINTIFF'S CFEPA CLAIMS SHOULD BE DISMISSED FOR LARGELY THE SAME REASONS AS HIS ADA CLAIMS

Connecticut Courts generally analyze ADA and CFEPA claims under the same standard. *Buck v. AT&T Servs. Inc.*, 2010 WL 2640045, *1, n.1 (D. Conn. 2010); *Tomick v. United Parcel*

*Service, Inc.*, 135 Conn. App. 589, 612 (2012) (Although claim is based solely on Connecticut law, we review federal precedent concerning employment discrimination guidance in enforcing our own anti-discrimination statutes). *In Buotote, supra*, the Court opined that although the CFEPA applies more broadly than the ADA, the evidentiary standards are the same and although the CFEPA has no "substantial limitation" requirement, the need for corroborating medical evidence of disability under the ADA is also required under CFEPA. *Id.* at 556. Thus, for the same reasons the company advanced above for the dismissal of the ADA claims, Plaintiff's CFEPA claims should, likewise, be dismissed.

Moreover, in addition to the foregoing reasons, should the Court dismiss the ADA claims, this Court would no longer have supplemental jurisdiction over Plaintiff's CFEPA claims as the only other federal claim Defendant believes Plaintiff is asserting is under the FMLA, and as will be shown below, Plaintiff's FMLA claim cannot survive summary judgment. *See Bellamy, supra*, *7 (Court declined to exercise supplemental jurisdiction over plaintiff's CFEPA claim, in a non-diversity case, once federal ADA claim was dismissed on summary judgment).

### IV. PLAINTIFF'S FMLA CLAIM SHOULD BE DISMISSED BECAUSE: IT IS PRECLUDED BY THE SETTLEMENT AGREEMENT; AND PLAINTIFF FAILS TO ALLEGE ANY FACTS THAT HE GAVE ANY NOTICE OF HIS NEED OR INTENTION TO TAKE FMLA LEAVE

**A.    Plaintiff's FMLA Claim Was Released Pursuant to Settlement Agreement**

As the record makes clear, Plaintiff entered into a Settlement Agreement which expressly released the company from every claim from the beginning of time until his reinstatement, with the exception of his then pending Complaint with the CHRO and his then pending Charge with the EEOC or any litigation arising out of those Charges. [56.1 ¶¶ 159-164.] It is manifest that Plaintiff's FMLA claim was not and could not have been part of or included in Plaintiff's EEOC Charge or CHRO Charge as neither agency has jurisdiction over FMLA claims. The federal

FMLA is within the jurisdiction of the U.S. Department of Labor, not the EEOC, and the Connecticut FMLA is governed by the State Department of Labor. *See* § 31-5199-43(c) of the regulations of Connecticut State Agencies; *Roberts v. Area Cooperative, supra*; *see also* Exhibit 24, excerpts from EEOC website showing it has no jurisdiction over FMLA claims. Because an FMLA claim cannot, as a matter of law, stem from the CHRO or EEOC Charges, it cannot be brought in the instant lawsuit as it has been released pursuant to the Settlement Agreement.

It is well-settled principle of law that "[a] release is a contract to which the ordinary rules of contract interpretation apply." *Lapuk v. Robert Simons*, 1995 Conn. Super. LEXIS 5, at *9, 17, *aff'd*, 41 Conn. App. 750, *cert. denied*, 239 Conn. 926, 677 A.2d 24 (1996). *See also, Muldoon v. Homestead Insul. Co.*, 231 Conn. 469, 482, 650 A.2d 1240 (1994). In this regard, it is a "general rule of contract construction that unambiguous contract provisions are to be given their plain meaning without reference to evidence outside the four corners of the agreement." *Sims v. Honda Motor Corp.*, 225 Conn. 401, 405 (1993). Moreover, there is definitive contract language, the "determination of what the parties intended by their contractual commitment is a question of law." *Gurliacci v. Mayer*, 218 Conn. 531, 567, 590 A.2d 914 (1991).

Here, the black letter language of the release is clear -- the only claims presented and ripe for litigation were his CHRO or EEOC Charges or litigation relating to those Charges. All other claims were released. As such, Plaintiff's FMLA claim, not being subject to CHRO or EEOC jurisdiction, was released and must be dismissed.

**B.**   **Plaintiff's FMLA Claim is Not Support by the Undisputed Facts**

In the event the Court does not find the FMLA claim is barred under the express terms of the Settlement Agreement, Plaintiff's FMLA claims still falls short as he has not presented an FMLA interference claim -- Plaintiff is trying to fit a square peg into a round hole and it just does not fit. To assert a *prima facie* case for FMLA interference, Plaintiff must show he gave

notice of his plan to take leave and that he was denied benefits. *Dicara v. Connecticut Rivers Council*, 663 F.Supp.2d 85, 95 (D. Conn. 2009).   Nowhere within Plaintiff's deposition testimony or in the allegations contained in his Complaint does he contend he gave notice to the Company that he needed FMLA leave.   Even in unforeseeable circumstances, a plaintiff must notify his employer, as soon as practicable, of his intention to take FMLA leave.   Because the Plaintiff, as a matter of undisputed fact, never provided notice to his employer of his need to take FMLA leave, the FMLA claim should be dismissed.[39]

## V.   PLAINTIFF'S CLAIMS OF INTENTIONAL AND NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS ARE: RELEASED UNDER THE SETTLEMENT AGREEMENT; BARRED BY THE EXCLUSIVITY PROVISION OF THE CONNECTICUT WORKERS' COMPENSATION ACT AND ARE, ON THEIR FACE, FACTUALLY AND LEGALLY DEFICIENT

**A.   Plaintiff's Claims of Intentional Infliction of Emotional Distress ("IIED") and Negligent Infliction of Emotional Distress ("NIED") Were Released Under the Settlement Agreement**

Pursuant to the Settlement Agreement discussed *supra*, Plaintiff's claims of IIED and NIED, which are personal injury tort claims, are plainly not within the jurisdiction of the EEOC and CHRO, and thus were released and not preserved under the Settlement Agreement.

**B.   Plaintiff's IIED and NIED Claims are  Barred by the Exclusivity Provisions of the Workers' Compensation Statute**

Plaintiff's attempt to recover damages for intentional and negligent infliction of emotional distress resulting from a physical injury, as independent torts, Counts 6 and 7, respectively, are factually and legally deficient, and are nevertheless barred by the exclusivity provisions of Connecticut's Workers' Compensation statute, § 31-284(a) (the "Act").  Where the Act covers a claim, "statutory compensation is the sole remedy and recovery in common law tort

---

[39] It is not clear from Plaintiff's pleadings whether he is asserting a state or federal FMLA claim.  If he is asserting a state FMLA claim, it should likewise be dismissed, in addition to the reasons set forth above for the dismissal of the federal FMLA claim, because he failed to exhaust his administrative remedies by filing with the Connecticut Department of Labor, therefore, depriving the Court of subject matter jurisdiction over this claim. *See Roberts, supra*, (Court has no subject matter as Plaintiff failed to exhaust his administrative remedies

against the employer is barred." *Meyers v. Arcudi*, 915 F.Supp. 522, 524 (D. Conn. 1996) (Intentional and negligent infliction claims barred by the exclusive remedy provisions of Workers' Compensation). *Accord, Gregory v. Southern New England Telephone Co.*, 896 F.Supp. 78, 84-85 (D. Conn. 1994). The exclusivity provisions of the Act "operate as a total bar to actions brought by employees against employers for job related injuries. *Quimby v. Kimberly Clark Corp.*, 28 Conn. App. 660, 666 (1992). *See Green v. Toburen*, CV 980063898S, 2000 WL 894680, *3-4 (Conn. Super. June 2000) (Granting summary judgment in favor of defendant on plaintiff's claims for negligent and intentional infliction of emotional distress and assault on the grounds that they were barred by the exclusive remedy provisions of the Workers' Compensation Act). *See also, Gregory, supra*, (plaintiff's claims for intentional infliction of emotional distress are also barred by the WCA); *Alexandra v. Strong*, 81 Conn. App. 68, 71 (2004). Here, as a matter of settled law, Plaintiff's claims of IIED and NIED are barred by the Act.

### 1. To the Extent Necessary, the Company Should be Granted Leave to Amend its Answer to Assert the Workers' Compensation Bar as an Affirmative Defense

The Workers' Compensation bar is not on the list of defenses that must be pled under Fed. R. Civ. P. 8(c) (which is not an exhaustive list) and was not originally pled by the Company as an affirmative defense. To the extent this Court is of the view it should have been pled as an affirmative defense, the Company respectfully requests that the Court, pursuant to settled law, construe this motion for summary judgment as also a motion for leave to amend its answer to assert the Workers' Compensation bar as an affirmative defense.

The law in the Second Circuit is clear that the District Court may, in its discretion, construe a motion for summary judgment as a motion pursuant to Fed. R. Civ. P. 15(a) for leave to amend defendant's answer to assert an affirmative defense such as, in the instant case, the Workers' Compensation bar. *Monahan v. N.Y. City Dept. of Corr.*, 214 F.3d 275, 283 (2d Cir.

2000); *Anthony v. City of New York*, 339 F.3d 129, 138 (2d Cir. 2003), *citing, State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981) (Rule 15(a) provides that leave to amend "shall be freely given when justice so requires; and we have interpreted this instruction in favor of allowing the amendment absent a showing by the non-moving party of bad-faith or undue prejudice").

Here, there is nothing in the record to remotely suggest bad faith.  To the extent it is even necessary to plead the Workers' Compensation bar as an affirmative defense (such a defense could easily fall within the "failure to state a cause of action" affirmative defense), it was mere oversight on the part of the Defendant not to plead the defense to these ancillary claims and most importantly, there is no prejudice to the Plaintiff to allow Defendant to assert this as an affirmative defense.  [Allen. Decl. at ¶ 8.]  The Plaintiff pled the emotional distress causes of action in his Complaint and conducted discovery accordingly.  Every company is required, as a matter of law, to have Workers' Compensation insurance so it is not as if Plaintiff would have to probe this issue in discovery.  The inquiry and issue remain the same, regardless of whether this was specifically pled as an affirmative defense -- are the facts, as Plaintiff alleged in his complaint and testified to in his deposition, sufficient to fall outside the scope of the exclusivity provisions of the Act?  The obvious absence of undue prejudice to the Plaintiff should allow, in the Court's discretion, for the Defendant to amend its pleading to assert the Act as an affirmative defense.

**C.    Plaintiff Fails to State a Cause of Action for**
       **Intentional Infliction of Emotional Distress**

Even if the Court finds that Plaintiff's claim for IIED is not barred by the Settlement Agreement or the laws of Workers' Compensation, it is, nevertheless, barred because the allegations are insufficient to state a viable cause of action.  In order to prove intentional

infliction of emotional distress, a plaintiff must show that: (1) the defendant intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of its conduct; (2) the conduct was extreme and outrageous; (3) the defendant's conduct was the cause of the emotional distress; and (4) the emotional distress sustained by plaintiff was severe. *Appleton v. Board of Educ. of Stonington*, 254 Conn. 205, 210, 757 A.2d 1059, 1062 (2000). It is not enough that the defendant acted with a tortious or even malicious or criminal intent, or that the defendant intended to inflict emotional distress. The conduct itself must be extreme and outrageous. *McGrath v. Yale Corp.*, No. CV920326144, 1993 WL 182370, at *4 (Conn. Super. Ct. May 17, 1993). Moreover, the determination of whether a defendant's conduct is extreme and outrageous is initially an issue of law for the Court. *Appleton*, 254 Conn. at 210, 757 A.2d at 1062; *Roberts v. Circuit-Wise, Inc.*, 142 F.Supp.2d 211, 218 (D. Conn. 2001) (emphasis supplied).

Liability has been found only where the conduct has been so outrageous in character, so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. *Roberts, supra*, at 218. *Little v. Yale University*, 92 Conn. App. 232, 239-40, 884 A.2d at 431-32 (2005) (internal quotation marks and citations omitted), *cert. denied,* 276 Conn. 936, 891 A.2d (2006). The act of firing an employee, even if done for unlawful reasons, is not sufficient to state a claim for IIED. *Huff v. West Haven Bd. of Ed.*, 10 F.Supp. 2d at 117, 122-23 (D. Conn. 1998). Federal District Courts in the Second Circuit have narrowly interpreted the requirement of "extreme and outrageous" conduct. Indeed, mere termination of employment is usually insufficient to satisfy the extreme and outrageous

standard for a claim of IIED. *Cyrus v. Papa's Dodge, Inc., supra.* [40] Here, Plaintiff points to his termination as the sole basis for his IIED claim. [56.1 ¶ 207.] As such, there is simply nothing in the record that rises to the level of extreme and outrageous behavior necessary to sustain a claim for IIED.

Moreover, even if the conduct could, in some way be deemed sufficiently extreme and outrageous, Plaintiff's claim must still fail as he cannot sustain his burden of showing that he suffered severe emotional distress, as a matter of law. *Muniz*, 59 Conn. App. at 708-09, 757 A.2d at 1211. In order to recover for intentional infliction of emotional distress, a plaintiff must prove that he or she has suffered *severe* emotional distress. *Rizzo v. New Haven Register*, No. CV02467267, 2005 WL 2857463, at *4-5 (Conn. Super. Ct. Oct. 7, 2005). "[C]ourts find liability only where the distress inflicted is so severe that no reasonable man could be expected to endure it." *Id.* at *4. Absent a showing that the emotional distress suffered was severe and was attributable to the defendant's conduct, there can be no liability. *See Rizzo, supra*, 2005 WL 2857463, at *4-5. (No severe emotional distress without expert testimony offering to link the symptoms to the Plaintiff's working conditions.)[41]

Plaintiff's own deposition testimony, together with his responses to Defendant's Request for Admissions, are the deathblow to his IIED claim. Plaintiff testified that when he was out of work, he was suffering from emotional distress, but currently today, he is not suffering from emotional distress. [56.1 ¶ 208.] When Plaintiff was out of work, and allegedly suffering from

---

[40] *See Muniz v. Kravis*, 59 Conn. App. 704, 708-09, 757 A.2d 1207, 1211 (2000) (sending armed guard to plaintiff's home to advise her of her termination and evict her while her husband was recovering from surgery not extreme and outrageous).

[41] *See e.g., Wells v. Plainfield*, 2005 Conn. Super. LEXIS 65 (Conn. Super. Jan. 11, 2005) (A plaintiff can recover for IIED only if they have incurred severe emotional distress…Generally, courts find liability where no reasonable man could be expected to endure it. The intensity and duration of the distress are factors to be considered in determining severity); *Stapleton v. Monro Muffler*, 2003 Conn. Super. LEXIS 321 (Conn. Super. Feb. 3, 2003) (Concluding that plaintiff's symptoms of loss of appetite and sleep for weeks, for which he did not seek medical treatment, were not sufficiently severe).

emotional distress, he did not see a psychologist or therapist. [56.1 ¶ 209.] Moreover, Plaintiff admitted: he has not been diagnosed by a doctor as suffering from mental anguish or emotional distress as a result of his employment or separation from the Company; he has not been treated at any medical facility for mental anguish or emotional distress; and he has not, at any time, taken any medication for emotional distress. [56.1 ¶¶ 208-211.] Plaintiff's failure to sustain his burden that he has suffered or suffers from emotional distress is a reason, in and of itself, for Plaintiff's claim for IIED be dismissed.

**D.**     **Plaintiff Fails to State a Claim for Negligent Infliction of Emotional Distress**

Likewise, even if the Court finds that Plaintiff's claim for NIED is not barred by the exclusivity provisions of Workers' Compensation or by the release provisions of the Settlement Agreement, it nevertheless should be dismissed as Plaintiff has not sustained his factual burden. "To prevail on a claim of negligent infliction of emotional distress, the plaintiff must plead and prove the following: (1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress...Thus, [t]he plaintiff must prove that the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or bodily harm." (Citation omitted; internal quotation marks omitted.) *Stancuna v. Schaffer*, 122 Conn. App. 484, 490 (2010).

Plaintiff's claim for NIED cannot survive summary judgment as, by his own admission, the Company did not engage in the necessary conduct for Plaintiff to establish an NIED claim. The basis for Plaintiff's NIED claim is that "he should have been offered help on the night in question as he should have been escorted with his Union to find out what is going on." [56.1 ¶ 214.] When Plaintiff was asked if there was anything else upon which he bases his NIED claim

on, he testified, "just that there." [56.1 ¶ 215.] Those allegations, on their face, are insufficient to satisfy the first prong of an NIED claim, namely that Defendant's conduct created unreasonable risk of causing the Plaintiff emotional distress.  Moreover, as with his IIED claim, Plaintiff cannot establish that he suffered severe emotional distress as a result, or that he suffered more than the normal distress that results from job loss.  *See e.g., Parsons v. United Technologies Corp.*, 243 Conn. 66, 88-89 ("The mere termination of employment, even where it is wrongful, is therefore not, by itself, enough to sustain a negligent infliction of emotional distress claim").  Consequently, summary judgment should be entered dismissing the NIED claim.

## CONCLUSION

Based on the foregoing, Connecticut Container respectfully requests that its motion for summary judgment be granted and that Plaintiff's Complaint be dismissed in its entirety.

**ABBOTT, REISS & ALLEN, P.C.**
Attorneys for Defendant


By: _____
      Guy M. Allen, Esq. (phv0226)
90 Merrick Avenue, Suite 501
East Meadow, New York 11554
P: (516) 222-1300
F: (516) 222-1311
gallen@abbottreissallen.com

**EPSTEIN BECKER & GREEN, P.C.**
Attorneys for Defendant
Dean R. Singewald II, Esq. (ct16708)
One Landmark Square, Suite 1800
Stamford, Connecticut 06901-2601
P: (203) 348-3737
F: (203) 324-9291
dsingewald@ebglaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 27, 2012, a copy of the foregoing Memorandum of Law in

Support of Defendant's Motion for Summary Judgment and For Leave to Amend its Answer was

filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of

this filing will be sent by e-mail to all parties by operation of the court's electronic filing system

or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic

Filing.  Parties may access this filing through the court's CM/ECF System.


Guy M. Allen (phv0226)
**ABBOTT, REISS & ALLEN, P.C.**
90 Merrick Avenue, Suite 501
East Meadow, New York 11554
P: (516) 222-1300
F: (516) 222-1311
gallen@abbottreissallen.com

41