# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

ANTHONY WILLOUGHBY,

               Plaintiff,

  v.

CONNECTICUT CONTAINER CORP.,        3:11-CV-00992 (CSH)

            Defendant.

## RULING ON DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

**HAIGHT**, Senior District Judge:

## I.    Introduction

This is an employment discrimination case.  Plaintiff Anthony Willoughby (hereinafter "Plaintiff" or "Willoughby") accuses his employer, Connecticut Container Corp. (hereinafter "Defendant") of violating the Connecticut Fair Employment Practices Act (hereinafter the "CFEPA"), Conn. Gen. Stat. §§ 46a-51, *et seq.*, the Americans With Disabilities Act (hereinafter the "ADA"), 42 U.S.C. § 12101, *et seq,* and the Family Medical Leave Act, (hereinafter the "FMLA"), 29 U.S.C. § 2601, *et seq.*  Plaintiff asserts that Defendant discriminatorily terminated Plaintiff's employment in violation of the ADA; that Defendant unlawfully failed to accommodate Plaintiff's disability in violation of the ADA; that Defendant retaliated against Plaintiff for occurrences due to his disability in violation of the ADA; that Defendant discriminatorily terminated Plaintiff's

employment in violation of the CFEPA; that Defendant retaliated against Plaintiff for occurrences due to his disability in violation of the CFEPA; and that Defendant interfered with Plaintiff's rights under the FMLA.  In addition, Plaintiff asserts common law claims against Defendant for intentional infliction of emotional distress and negligent infliction of emotional distress.  *See* [Doc. 21] at 7-20.

Defendant denies all liability, and now moves for summary judgment dismissing all aspects of the Amended Complaint, i.e., [Doc. 21], claiming that:  Plaintiff is not disabled within the meaning of the ADA; Plaintiff was not terminated due to his diabetes or other medical condition; Plaintiff cannot prevail on an ADA failure to accommodate claim since Plaintiff never overtly asked for an accommodation; neither Plaintiff's termination nor any subsequent behavior on the part of Defendant were retaliatory under the ADA; Plaintiff's CFEPA claims should fail for the same reasons as Plaintiff's ADA claims; Plaintiff is barred from asserting an FMLA interference claim by a Settlement Agreement he entered into with Defendant; Plaintiff was not entitled to FMLA leave under the circumstances; and Plaintiff's common law claims of intentional infliction of emotional distress and negligent infliction of emotion distress must also fail.

The Court now decides Defendant's Motion for Summary Judgment and for Leave to Amend Answer, [Doc. 25].

## II.   Background

The following facts, culled from the pleadings and exhibits thereto, are relevant to the current motion.

Defendant is a manufacturer of corrugated packing solutions located in North Haven, Connecticut.  Plaintiff initially became an employee of Defendant in 1978.  In early 2009, Plaintiff states that he "began to experience health problems that included symptoms of loss of vision,

2

sweating, vertigo, loss of focus[,] and inability to stand," and, "[a]t that time, Plaintiff was diagnosed with type two (2) diabetes and high blood pressure." [Doc. 35] at 10. Shortly thereafter, Plaintiff submitted a Family Medical Leave Act form to Deborah Delgado, Defendant's Human Resources Manager. The information on the form, signed by Plaintiff's doctor on March 5, 2009, and stamped "[r]eceived March 11, 2009," states that on February 24, 2009 Plaintiff had been diagnosed with diabetes and had been admitted to Yale New Haven Hospital for hyperglycemia, dehydration, and tachycardia, with a blood sugar level above 500. [Doc. 35-7] at 1. Plaintiff's doctor indicated that Plaintiff had needed to miss several days of work due to diabetes-related illness, and that Plaintiff was expected to be able to return to work by March 8, 2009. *Id.* The doctor also reported that at that time he did not expect Plaintiff to need to take work only intermittently or to work on a less than full schedule as a result of his medical condition, and that while Plaintiff's diabetes was a chronic condition, the doctor did not at that time "expect episodes of incapacity;" though Plaintiff, who had been placed on a medication regimen for his diabetic condition, would "continue to be seen for his [d]iabetes," the doctor did "not expect" that Plaintiff would miss additional work for such treatment. *Id.* at 1-2.

Plaintiff states that subsequent to his return to work, he experienced several side effects of the diabetes-related medications on which he had been placed, and that, presumably as a result, such "medications were constantly changing and being adjusted, which [impacted] his ability to work and caused him swelling, dizziness, blurred vision[,] and made him use the bathroom a lot." [Doc. 35] at 12. In addition, Plaintiff avers, "[e]nvironmental factors such as heat" had an impact on these side effects, as well as heightened Plaintiff's diabetes-related limitations. *Id.*

On August 20, 2009 – over five months after he had initially been diagnosed with diabetes

– Plaintiff reported to work around 10:00pm feeling unwell. *Id.* at 12-13. He states that "[o]n that particular evening, and for the two weeks prior, [he] was assigned to work on the transfer car, which required that he perform more strenuous physical activity," and that "working on the transfer car ... was too much for him" and, among other things, made his ankles swell, something which Plaintiff claims he informed his supervisor, Darlene Bailey, who allegedly responded that Plaintiff must "do the work or go home." *Id.* at 12. Plaintiff states that he "also complained to the union," which "brought the matter to [Deborah] Delgado[] one week prior to the incident, but Plaintiff was not removed from the transfer car," and, accordingly, was forced to work there and was consequently "exposed to heat," which Plaintiff avers had a negative impact on his vision. *Id.* at 12-13. That evening, Plaintiff states that he "advised Angel Cruz, the lead man and acting supervisor in charge of overseeing the third shift" which Plaintiff would be working "that he was not feeling well, had pain in his foot[,] and that if he did not feel any better, he was going home." *Id.* at 13; *see also, e.g.*, [Doc. 35-9] at 3. However, Cruz, in his own words, "was very busy, and ... brushed [Plaintiff] off." [Doc. 35-9] at 3.

Later in the evening of August 20, 2009, after feeling increasingly unwell, "Plaintiff suffered from an episode of hypoglycemia and dehydration which caused him to pass-out." [Doc. 35] at 13. Plaintiff – who was not responding to pages – was later found by Darlene Bailey in a chair and not awake or alert. [Doc. 35-6] at 11. Bailey states that Plaintiff appeared to her to be sleeping, and that he woke when she called his name. *Id.* After Plaintiff woke, Bailey states, he appeared to be disoriented. Bailey told him Plaintiff he should not be sleeping, and sent him home. *Id.* at 11-12. She also states that she contacted Cruz as well as the workers' "union rep and ... made him aware of what was going on." *Id.* at 12. Plaintiff avers that he told Bailey that he had not been sleeping, but

4

did not know what had happened. [Doc. 21] at 4. Plaintiff states that "Bailey did not ask or investigate what [had] caused Plaintiff to pass out and did not ask Plaintiff if he was able to drive home," and that after Plaintiff had walked to the "parking lot [he] was unable to locate his car then realized he didn't drive a car he drove a pickup[] truck and was unable to recall how he got home." [Doc. 35] at 14.

Bailey prepared a statement with respect to what had occurred that evening, and left it for the plant manager. The full text of the statement is as below:

> On Thursday August 20, 2009 I paged Anthony Willoughby to give him instructions for the evening at 12:40. I waited about 10 minutes to response. I then went to the baler room to check. He was not there. I went to the corrugator and I found Anthony had taken a chair and set it [alongside] the propane tanks [outside] and fallen asleep. I stood close to him and called his name when[] he did not respond[] I shook his arm. Anthony then jumped up from the chair and said I'm sorry. I then told Anthony to go home and we would deal with this issue on Monday. My next step was to go to Roland Johnson (union [official]) and Juan Ariznabarreta to make them aware of what had just gone on.
>
> Darlene L. Bailey

*See* [Doc. 35-17] at 1. Barry Besen, Defendant's Chief Operating Officer, Executive Vice President, and General Manager, was advised of Plaintiff's August 20, 2009 incident by one of the plant's two acting managers, Walter Vazquez and Michael Deubel, and was involved in investigating what had transpired the following day. [Doc. 35] at 14. Due to inconsistencies which arose in the investigation, including photographic evidence and Bailey's subsequent assertions, Plaintiff raised questions about whether video cameras at the plant were operative on the evening in question. *Id.* at 14-15. Defendant in turn raised questions regarding why Plaintiff had been on the platform on which he had passed out on a chair, and whether he had really passed out, or was merely hiding the fact that he was sleeping on the job.

Plaintiff immediately sought medical treatment after this incident and was placed on medical leave by his doctor from August 21, 2009 through August 22, 2009, with a return date of August 23, 2009 if Plaintiff was then feeling better. [Doc. 35-3] at 1.  A doctor's medical form indicated that Plaintiff had been under medical care for "acute illness/dehydration." *Id.*  Plaintiff's doctor provided a second medical form ten days later, on August 31, 2009.  *See* [Doc. 35-5] at 1.  This second form stated that Plaintiff had been receiving medical care for "hypoglycemia and syncope," and would "be seeing a diabetes specialist." *Id.*  The note also appears to state that the doctor "believed"[1] that Plaintiff had "passed out due to low blood sugar," but could return to work as of August 31, 2009. *Id.*  Plaintiff attempted to furnish at least medical form to Delgado – Plaintiff avers more than one, but Defendant disputes that claim – who states that when Plaintiff gave the documentation to her, she responded: "What do you want me to do with these?  Like you don't have FMLA for this.  What do you want me to do?"  [Doc. 35-8] at 29.  Delgado states that she then spoke with Barry Besen about the medical form(s) Plaintiff had provided, remarking to him that Plaintiff had submitted them "after the fact, so [Delgado did not] know why [Defendant] would accept them." *Id.*  Delgado states that Besen told her that she "shouldn't accept those notes," and that she is unsure as to whether she kept them. *Id.*

Delgado further states that in the course of preparations for Plaintiff's termination, i.e., in the time between August 21, 2009 and August 27, 2009, Besen asked her if Plaintiff "had family medical leave paperwork," to which she responded "yes." [Doc. 35-8] at 13.  Delgado also states that she provided Besen with that paperwork.  *Id.* at 15.  She and Besen then discussed if Plaintiff "ha[d] a

---

[1]  The word "believed" is difficult to decipher; however, it appears to be what was written.

current medical condition." *Id.* at 13.  Ultimately, Delgado states, it was decided that Plaintiff "was to be terminated for sleeping on the job because [Defendant] had other employees that were terminated for sleeping on the job and ... [it] needed to remain consistent in [its] dealings with others." *Id.*

Prior to Plaintiff's termination, which took place on August 27, 2009, Plaintiff attended a meeting with Vasquez, Deubel, and Plaintiff's union representative, James Streeter. [Doc. 35] at 16. Vasquez and Deubel were at that time in possession of Plaintiff's employee file, which contained his medical documents and forms.  *See* [Doc. 35-13] at 7 (in which Besen testifies that in August 2009 these individuals "did have the file with all [Plaintiff's] information including the medical conditions.").  In this meeting, Plaintiff reiterated that he had gotten lightheaded and passed out on the evening of August 21, 2009, that he and his union representative Streeter again provided Vasquez and Deubel with all the medical notes currently in Plaintiff's file, also verbally informing them that the incident that had taken place a few days prior had been related to his diabetic condition.  *See* [Doc. 35-14] at 5.  At the end of this meeting, Vasquez and Deubel told Streeter and Plaintiff that they would get back to them.  *Id.*  Besen has testified that he reviewed Deubel's handwritten notes from this meeting, suggesting that he was further aware that Plaintiff's incident had likely been diabetes-related. [Doc. 35-13] at 14.

Despite the medical information to which Defendant was privy, Defendant formally terminated Plaintiff on August 27, 2009, for hiding and sleeping while at work.  No potential work accommodations were offered to Plaintiff prior to this decision, nor was the possibility of any such accommodation raised.  Defendant claims that termination of employees for sleeping on the job is party of their policy; however, Plaintiff avers that "[u]nder Defendant's [employee] policy, sleeping

7

is not delineated as a cause for summary termination and the policy [does] not express any disclaimer that the list [of offenses warranting termination] was not exclusive or exhaustive" – and, further, that another employee who had been terminated for sleeping at work, Thomas Rice, who suffered from sleep apnea, had only been "ultimately terminated when several instances of sleeping inside a machine caused a safety risk," had fallen asleep at work between twenty and thirty times prior to his termination, and, even more critically, had first "receiv[ed] multiple warnings, accommodations[,] and opportunities to receive medical clearance." [Doc. 35] at 18-19.

Deborah Delgado, head of Human Resources for Defendant, testified that she did not know why Plaintiff was not held to the same standard as Rice. [Doc. 35-8] at 25-26.  As well, Darlene Bailey testified that she was surprised to learn that Plaintiff was being terminated due to the August 21, 2013 incident, given "past precedent," which had "already been set one way," and referred to this decision as Defendant "doing something different." [Doc. 35-6] at 18-19.  Besen, Defendant's chief Operating Officer, Executive Vice President, and General Manager, who upheld the decision to terminate Plaintiff, agreed that Defendant had exhibited a different past practice with respect to Rice as it had afforded him progressive discipline on the job. [Doc. 35-13] at 29.

Defendant cancelled Plaintiff's health insurance coverage on August 23, 2009, four days prior to his termination and one day prior to his meeting with Vasquez and Deubel.  *See* [Doc. 35-33] at 1.  Such termination was made retroactively effective to August 20, 2009 "for sleeping on the job." *Id.*  Plaintiff alleges, however, that Defendant continued to take out insurance payments for an additional five weeks.  Defendant also subsequently contested Plaintiff's claim for unemployment compensation and reported to the State of Connecticut Department of Labor that Plaintiff had been terminated for violating a policy against employees "sleeping on the job." [Doc. 35-31].  (Though

Plaintiff alleges that Defendant had no such formal policy.)  In Defendant's Department of Labor Fact Finding Report-Employer Statement, dated August 29, 2009, Defendant averred that Plaintiff "ha[d] received several verbal warnings for sleeping on the job" – something which Plaintiff contests and which the record does not appear to support – and that "[i]t is against company policy to sleep on the job and he was aware of this policy." *Id.*  Plaintiff claims that "[w]ith no medical insurance, [he] was unable to pay for his medications and was unable to seek medical treatment for his diabetes or his emotional distress," which, he states, were aggravated by Defendant's actions and treatment of him, leading him to seek, among other things, spiritual help.  *See* [Doc. 25] at 22-23.

Subsequent to Plaintiff's termination, Plaintiff filed a formal grievance against Defendant. The four-step grievance process resulted in denials at all four steps, the last of which was overseen by Besen.  Plaintiff's grievance was then taken to arbitration.  Of this, Plaintiff writes, "Besen and Vasquez asked Bailey to give testimony at the arbitration and offered her money in exchange for that testimony." [Doc. 35] at 21.  Bailey corroborates this, stating that Vasquez and Besen offered her money in exchange for her testimony, and that they offered her compensation to do so, which she understood not to be "th[e] type of compensation" given for travel milage. [Doc. 35-6] at 19-20.  Her response to them was "[y]ou don't have enough money," and she did not learn the nature of the compensation that was being offered.  *Id.*

The arbitration hearing, which had been scheduled for April 22, 2010, did not ultimately occur, as prior to that date Plaintiff and Defendant entered into a Settlement Agreement pursuant to which Defendant agreed "to reinstate [Plaintiff's] employment with the Company with full seniority effective May 10, 2010." *See* [Doc. 35-15] at 1. Pursuant to the terms of this Settlement Agreement, Plaintiff was to "be reinstated to the position and shift of his choosing based upon his bumping rights

under the parties['] collective bargaining agreement," and agreed that he would "not receive payment of any kind (pay, benefits, paid time off, etc.) for the period of his termination on August 20, 2009 until the time of his reinstatement on May 10, 2010," with the exception of Defendant agreeing to provide him "with full pension credit up to and including the date of his reinstatement." *Id.* Plaintiff agreed "to release the Company and Union from any and all claims he has or may have, from the beginning of time until the date of his reinstatement arising out of his employment with the Company that allege a violation of the collective bargaining agreement, except for any claims he [was] prohibited from waiving by law." *Id.* at 2. However, such a release did not include Plaintiff's then-pending complaint with the CHRO or his then-pending "Charge with the EEOC," or, for that matter, "any litigation arising out of said charges." *Id.*

Plaintiff's then-pending complaint with the CHRO and Charge of Discrimination with the EEOC had been filed on November 9, 2009 and "included claims of disability discrimination, failure to accommodate a known disability, retaliation[,] and violation of the Family Medical Leave Act." [Doc. 35] at 21. Specifically, in his CHRO Charge of Discrimination Affidavit, Plaintiff claimed that, among other things:

- Defendant "falsely accused me of sleeping on the job without investigation or verification." [Doc. 35-19] at 3.

- Defendant "discriminated against me in my employment due to my disability and age." *Id.*

- Defendant "violated the Family Medical Leave Act." *Id.*

- Defendant "intentionally discriminated against me after learning of my diabetes and high blood pressure." *Id.*

- Defendant "is in violation of C.G.S. Sec. 51 et seq." *Id.*

- Defendant "is in violation of C.G.S. Sec. 46a-60(a)(1) for discriminating against me due to my age and disability." *Id.*

- Defendant "is in violation of the ADA for discriminating against me due to my diabetes and failing to accommodate a known disability." *Id.*

- Defendant "is in violation of the ADEA for terminating me in regards to my age, years of employment, seniority, and salary." *Id.*

During the CHRO's Fact Finding Conference convened in September of 2010, Defendant attempted to explain its decision by stating that Plaintiff had violated Defendant's Substance Abuse Policy due to Plaintiff's alleged failure to disclose prescription medications. The relevant language in the policy Defendant there provided is that "any employee who is taking any legal drug which might impair safety, performance, or any motor functions must advise his/her supervisor before reporting to work under such medication." *See* [Doc. 35-25] at 2; [Doc. 35-24] at 1. Plaintiff testified that his signature had been copied onto a purportedly signed copy of this Substance Abuse Policy; similarly, Bailey testified that the signature bearing her name on a copy of this Policy did not appear to be her signature. *See* [Doc. 35-6] at 97-98 (in which Bailey testified: "It's just different. It's not my signature.") However, Bailey also testified that by her knowledge all employees should be aware of Defendant's drug policy. *Id.* at 98.

Plaintiff formally received releases to sue Defendant from the CHRO on May 23, 2011 and from the EEOC on May 31, 2011, and filed this action on June 21, 2011. *See* [Doc. 35] at 22; [Doc. 1].

## III.    Standard of Review

The standards for summary judgment are familiar. Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment

as a matter of law." F. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986). The role of a district court in considering a motion for summary judgment is therefore "not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *In re Dana Corp.*, 574 F.3d 129, 151 (2d Cir. 2009). The moving party, in this case the Defendant, bears the burden of showing that it is entitled to summary judgment. Once it has satisfied this burden, in order to defeat the motion the party opposing summary judgment, in this case the Plaintiff, "must set forth specific facts demonstrating that there is a genuine issue for trial." *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir 2009) (internal quotation marks omitted). A dispute about a genuine issue of fact exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

In making its determination on a summary judgment motion, a trial court will resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 274 (2d Cir. 2009). It is "[o]nly when reasonable minds could not differ as to the import of the evidence" that summary judgment is proper. *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991). When "a motion for summary judgment is properly supported by documentary and testimonial evidence ... the nonmoving party may not rest upon the mere allegations or denials of his pleadings, but rather must present significant probative evidence to establish a genuine issue of fact." *Marczeski v. Gavitt*, 354 F.Supp. 2d 190, 193 (D. Conn. 2005) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986)).

In order to present a "genuine issue of material fact" the nonmoving party must therefore

present contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248.  Consequently the nonmoving party must present affirmative evidence in order to defeat a properly supported summary judgment motion.  As the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment," *Id.* at 247-48, if the nonmoving party submits evidence that is "merely colorable," summary judgment may be granted. *Id.* at 249-50. A "complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett,* 477 U.S. at 322.

## IV.   Legal Analysis

### A.   Plaintiff's ADA Claims

The ADA, as amended by the ADA Amendment Act of 2008 (hereinafter the "ADAAA"), Pub. L. No. 110-325 (2008), makes it unlawful for an employer to "discriminate against a qualified individual on the basis of disability in regard to ... terms, conditions, and privileges or employment." 42 U.S.C. § 12112(a).  This includes an employer's discriminatory discharge of an employee and not making reasonable accommodations to known physical limitations of an otherwise qualified individual with a disability, unless the employer is able to demonstrate that such accommodation would impose an undue hardship on the operation of the business. *See id; see also* 42 U.S.C. § 12112(b)(5)(B).

### 1.   Whether Plaintiff Was Disabled Under the ADA

Defendant contends that "Plaintiff was not disabled under the ADA." [Doc. 27] at 23.  The Court disagrees, and finds that the evidence presented is more than sufficient for a reasonable jury to return a verdict for Plaintiff on this point, particularly given that Plaintiff's passing out incident

and subsequent termination both took place in August of 2009 – over half a year after January 1, 2009, i.e., the effective date of the ADAAA.  "The ADAAA substantially broadened the definition of a 'disability' under the law[] in explicit response to" two United States Supreme Court cases, *Sutton w. United Air Lines*, 527 U.S. 471 (1999) and *Toyota Motor Manufacturing v. Williams*, 534 U.S. 184 (2002), "in which the ADA's terms defining 'disability' had been strictly defined." *Hutchinson v. Ecolab, Inc.*, 3:09-CV-01848, 2011 WL 4542957 at *7 (D.Conn. Sept. 28, 2011) (some internal quotation marks omitted).

In general, "[c]ourts apply a three-step approach to determine whether an individual is 'disabled' within the meaning of the ADA.  Plaintiff must first show that []he suffers from [an impairment].  Second, [Plaintiff] must identify the activity claimed to be impaired and establish that it constitutes a major life activity.  Third, [Plaintiff] must show that [such] impairment substantially limits the major life activity previously identified." *Palmieri v. City of Hartford*, __F.Supp. 2d. __, 2013 WL 2398365 at *9 (D.Conn. 2013) (quoting *Weixel v. Bd. of Educ. Of City of New York,* 287 F.3d 138, 147 (2d Cir. 2009)).

The ADAAA provides that the definition of "disability" should be construed in "favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter" – and, as well, that the term "substantially limits" should be "interpreted consistently with the findings and purposes of the [ADAAA]."  42 U.S.C. § 12102(4)(A) and (B).  Thus while under the ADA "disability" is defined as either (1) "a physical or mental impairment that substantially limits one or more major life activities of such individuals"; (2) "a record of such an impairment"; or (3) "being regarded as having such an impairment," *see* 42 U.S.C. § 12102(1), the ADAAA has gone far to "expand[] the interpretation of the ADA's three-category definition of

14

'disability.'"   *Hutchinson v. Ecolab, Inc.*, 2011 WL 4542957 at *7 .  Under the ADAAA, the term "major life activity" now "includes caring for oneself, performing manual tasks, walking, standing, lifting, bending, speaking, breathing..., and working," as well as "the operation of a major bodily function," including but not limited to functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions."  42 U.S.C. § 12102(2)(A) and (2)(B).

While the ADA itself does not define the term "substantially limited," post-ADAAA regulations state that this standard "is not meant to be a demanding [one]," and "should not demand extensive analysis."  29 C.F.R. § 1630.2(j)(1)(i) and (j)(1)(iii).  While these regulations went into effect subsequent to the events with which this lawsuit are concerned, they illuminate Congress's intent with respect to the application and interpretation of ADA protections, and are useful to, though not necessary for, the Court's analysis.  Pursuant to these regulations, "[a]n impairment is a disability ... if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population.  An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting."  29 C.F.R. § 1630.2(j)(1)(ii).  Any such "comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical analysis," and any "determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures."  29 C.F.R. § 1630.2 (j)(1)(v) and

15

(j)(1)(vi).[2]

Plaintiff has established through testimony and medical documentation that he suffers from diabetes and high blood pressure, as well as related symptoms and complications.  It is also readily apparent that Plaintiff was on a medication regimen for such conditions which was not yet stable or fully ameliorative at the time of Plaintiff's passing out at work and subsequent termination.[3]  Such symptoms and complications then included hyperglycemia, dehydration, tachycardia, high blood sugar, difficultly standing, and dizziness and faintness, as detailed *supra*.  The Court finds, given the expanded interpretation of the definitions of "disability" and "major life activity" directed by the ADAAA, that Plaintiff – who *suffers these symptoms due to diabetes*, which is by definition a disease which impacts the functioning of the endocrine system – could indeed easily be found by a jury to be an individual who has" a physical impairment that substantially limits one or more major life activities of such individual" and, accordingly, has a disability under the ADA.  *See* 42 U.S.C.

---

[2]   Thus to the extent Defendant also contends that Plaintiff has not presented the Court with adequate medical evidence of his diabetes-related limitations, and therefore cannot survive a motion for summary judgment with respect to the question of whether he has a disability under the ADA, the Court disagrees.  As our sister court noted last year, "[i]n enacting the ADA, Congress intended to provide 'broad coverage' for individuals with disabilities, and in enacting the ADAAA in 2008, [it] rejected Supreme Court precedent ... as 'intepret[ing] the term 'substantially limits' to require a greater degree of limitation than was intended,'" and, therefore, such determinations may be made without regard to scientific, medical, or statistical analysis or the ameliorative effects of mitigating measures.  *Kravtson v. Town of Greenburgh*, No. 10-CV-03142, 2012 WL 2719663 at *10 (S.D.N.Y. July 9, 2012) (citations omitted).

[3]   To aid in its contention that Plaintiff's diabetes ought not be considered a "disability" under the ADA, Defendant cites caselaw suggesting that essentially asymptomatic diabetic individuals – or diabetic individuals whose symptoms are well-controlled via appropriate medication – may not always be considered "disabled" under the ADA and related statutes.  However, Plaintiff *did* experience diabetes-related symptoms and medical difficulties in the relevant period; accordingly, such caselaw and suggestion is inapposite.  Further, the Court notes the 2012 EEOC regulations, cited *supra*, which state that ameliorative effects of medication do not alter an individual's disabled status.

16

§ 12102(1).  As EEOC regulations themselves note, "diabetes substantially limits endocrine function," and therefore "it should easily be concluded that [diabetes] will, at a minimum, substantially limit" what amounts to a major life activity.  29 C.F.R. § 1630.2(j)(3)(iii).[4]

## 2.    Plaintiff's Claim of Wrongful Discharge under the ADA

Defendant contends in its Motion for Summary Judgment that Plaintiff cannot state a sufficient claim that he was terminated due to his diabetes or other medical condition in order to survive a Motion for Summary Judgment.

The ADA prohibits discrimination against any "qualified individual with a disability because of the disability of such individual in regard to," *inter alia*, "discharge of employees."  42 U.S.C. § 12112(a).  In order to make out a prima facie case under the ADA for wrongful discharge, Plaintiff must establish that:  (1) his employer is subject to the ADA; (2) Plaintiff was disabled within the meaning of the ADA; (3) Plaintiff was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) Plaintiff suffered an adverse employment action because of his disability.  *Palmieri v. City of Hartford*, 2013 WL 2398365 at *9 (quoting *Giordano v. City of New York*, 274 F.3d 740, 747 (2d Cir. 2001)).

Neither party disputes that Defendant is subject to the ADA or that Plaintiff was otherwise qualified to perform the essential functions of his job with or without reasonable accommodation, and after a careful review of the evidence and the pleadings, the Court finds no reason to question that these are both the case.  The Court has, *supra*, addressed whether Plaintiff may be found to be disabled within the meaning of the ADA.  Consequently, the only prong which must be met in order

---

[4]   The Court again notes that while these regulations came into effect after the incidents in question in this case, they are useful to the Court in its analysis of the ADA and ADAAA and, as well, Congress's intent in the enaction of both.

for a prima facie case to be made is the fourth – i.e., that Plaintiff suffered an adverse employment action (here, being terminated or discharged) *because of his disability*. On this fourth prong, Defendant states that the individuals who decided to terminate Plaintiff's employment "were not even aware of Plaintiff's diabetes at the time they made the decision to terminate his employment," and therefore "Plaintiff's termination claim fails." [Doc. 27] at 14.

The Court finds, however, that there is a more than ample question of material fact as to whether this was actually the case, given that there is evidence and even testimony from those who were involved in the decision to terminate Plaintiff's employment, and to uphold this termination when it was appealed, which suggests that at the very least these decision-makers *were* aware that Plaintiff was a diabetic and that the incident in question had been medically determined to have been related to his diabetes. For example, Besen himself, Defendant's Chief Operating Officer, Executive Vice President, and General Manager, testified that Vasquez and Deubel were, prior to the initial decision to terminate Plaintiff, in possession of Plaintiff's employee file, which contained his medical documents and forms including those indicating that he did not merely fall asleep on the job, and that he would be seeing a diabetes specialist. *See* [Doc. 35-13] at 7 (in which Besen testifies that in August 2009 these individuals "did have the file with all [Plaintiff's] information including the medical conditions."). Further, in the meeting that took place with Vasquez and Deubel prior to Plaintiff's discharge, Plaintiff explicitly told Vasquez and Deubel that he had gotten lightheaded and passed out on the evening of August 21, 2009 and though his union representative again provided Vasquez and Deubel with the medical notes currently in his file, including one which indicated that the incident that had taken place a few days prior had been related to a diabetic condition. *See* [Doc. 35-14] at 5. Besen also testified that he reviewed Deubel's handwritten notes from this meeting.

18

[Doc. 35-13] at 14.  Without delving further into the record, it is apparent that such testimony and facts are more than sufficient for Plaintiff to survive a motion for summary judgment on this question.

Claims alleging discriminatory discharge under the ADA are analyzed under the burden-shifting analysis established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973).  *See, e.g., Rios v. Department of Educ.*, 351 Fed. Appx. 503, 504-05 (2d Cir. 2009); *Heyman v. Queens Vill. Comm. For Mental Health for Jamaica Cmty. Adolescent Program, Inc.*, 198 F.3d 68, 72 (2d Cir. 1999).  Accordingly, once Plaintiff has met his initial "burden of establishing a prima facie case (which is generally not understood by courts to be onerous)," under the *McDonnell Douglas* methodology the defendant must merely "*articulate* (not *prove*), via admissible evidence, a legitimate reason for the employment decision.... At that point, the plaintiff must have the opportunity to demonstrate that the employer's proffered reason was not the true reason for the employment decision," which may be accomplished "either by persuading the trier of fact that a discriminatory reason more likely than not motivated the employer, or by persuading the trier of fact that the employer's proffered explanation is unworthy of belief."  *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1180-81 (2d Cir. 1992) (internal quotation marks and citations omitted) (emphasis in original); *see also Rios v. Department of Educ.*, 351 Fed. Appx. at 504-05; *Weichman v. Chubb & Son*, 552 F. Supp. 2d 271, 289-90 (D. Conn. 2008).

As this Circuit has emphasized in the past, "courts [have] recognized that more than one reason can motivate an employer's adverse action"; thus, when applying a *McDonnell Douglas* analysis, courts have "said that [a] plaintiff had to prove" under the third prong of the analysis that the allegedly "impermissible reason, even though not the only reason for an adverse employment

decision, was a 'substantial' or 'motivating' factor," or, at the least, "'made a difference' in the decision." *Fields v. New York State Office of Mental Retardation and Developmental Disabilities*, 115 F.3d 116, 120 (2d Cir. 1997) (in discussing the application of the *McDonnell Douglas* analysis to an adverse employment discrimination claim arising under Title VII) (quoting *Sherkow v. Wisconsin*, 630 F.2d 498, 502 (7th Cir. 1980), *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir. 1989) and citing *cf. Paolillo v. Dresser Industries, Inc.*, 865 F.2d 37, 40 (2d Cir. 1989), *as amended,* 884 F.2d 707 (2d Cir. 1989) (addressing this standard as it applies to a court's *McDonnell Douglas* analysis of alleged discrimination under the ADEA)); *see also, e.g., Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166 (same).

Even assuming that Defendant were able to credibly articulate a legitimate and non-discriminatory reason for having terminated Plaintiff's employment, for example that those making the decision to discharge Plaintiff had not known of Plaintiff's disability, or that, furthermore, these individuals really did believe that Plaintiff had fallen asleep rather than passed out and terminated his employment accordingly – arguments Defendant has in fact put forth in its pleadings – the Court would still unequivocally find, on the factual record discussed at length *supra*, that a genuine factual dispute exists as to the veracity of such claims.  Plaintiff has successfully "set forth specific facts demonstrating that there is a genuine issue for trial."  *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir 2009) (internal quotation marks omitted).  There is no question, given the evidence that it was clear to several of the decision-makers, in particular Besen, that Plaintiff *was* a diabetic at the time of his termination and the denial of his subsequent appeal, that these individuals knew that the incident in question – the only factor they seem to cite in their reasons for discharging him, aside from the drug policy claims not substantially raised in Defendant's summary judgment pleadings – stemmed from

his illness and not from his merely deciding to sleep while at work; and, furthermore, given evidence that Plaintiff's termination was not wholly consistent with the way in which Defendant has handled "sleeping" employees in the past, that a reasonable jury *could* decide in Plaintiff's favor on the question of whether Plaintiff had been wrongfully discharged under the ADA.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  It is "[o]nly when reasonable minds could not differ as to the import of the evidence" that summary judgment is proper.  *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991).

### 3.      Plaintiff's Failure to Accommodate Claim under the ADA

Defendant avers that "Plaintiff's claim under the ADA that [Defendant] failed to provide [Plaintiff] with an accommodation is baseless in view of the fact that Plaintiff himself testified he never asked for an accommodation, and all of the testimony taken is uniform in that [he] never sought [one].  It is beyond cavil that in order to assert a failure to accommodate claim, an employee must first ask for one." [Doc. 27] at 14.  Plaintiff disagrees with this assessment of the required legal elements for claim of failure to accommodate under the ADA, and, furthermore, contends that even if this Court were to impose the obligation upon Plaintiff to request an accommodation, Plaintiff would still prevail as to this claim "because he did request an accommodation on several occasions." *See* [Doc. 35] at 44.

In order "[t]o establish a prima facie case" that there was a failure to reasonably accommodate under "the ADA or the ADA Amendment Act of 2008, Plaintiff must show that (1) he was a person with a disability within the meaning of the statute; (2) Defendant ... had notice of [Plaintiff's] disability; (3) [Plaintiff] could perform the essential functions of the job with reasonable accommodation; and (4) Defendant refused to make such accommodation." *See Hutchinson v.*

*Ecolab, Inc.*, 3:09-CV-01848, 2011 WL 4542957 at *6 (D.Conn. Sept. 28, 2011) (emphasis omitted);

*Giordano v. City of New York*, 274 F.3d 740, 747 (2d Cir. 2001).   If Plaintiff "succeeds on the first

three elements of his ... claim, a failure to make reasonable accommodation amounts to a discharge

'because of' [P]laintiff's disability." *Hutchinson v. Ecolab, Inc.*, 3:09-CV-01848, 2011 WL 4542957

at *6.  As with claims of wrongful discharge under the ADA, should Plaintiff succeed in making a

prima facie case that Defendant did not provide reasonable accommodation in violation of the ADA,

the *McDonnell Douglas* burden shifting methodology must be applied.

 As discussed *supra,* neither party to this lawsuit disputes that Defendant is subject to the

ADA or that Plaintiff was otherwise qualified to perform the essential functions of his job with or

without reasonable accommodation, and after a careful review of the evidence and the pleadings, the

Court finds no reason to question that these are both the case.  The Court has, *supra*, addressed

whether Plaintiff may be found to be disabled within the meaning of the ADA.  Consequently, the

only prong which must be met in order for a prima facie case to be made is the fourth – i.e., that

Defendant did not provide Plaintiff with reasonable accommodation in violation of the ADA – and

the second, i.e., that Defendant had notice of Plaintiff's disability.

 Defendant appears to conflate the notice requirement present in the second prong of this

prima facie test with a requirement that Plaintiff *request* particular accommodations – or, for that

matter, request any accommodations at all.  The Second Circuit recently addressed the notice

requirement for reasonable accommodation claims under the ADA, noting that while "*[g]enerally*,

it is the responsibility of the individual with a disability to inform the employer that an

accommodation is needed," *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 135 (2d Cir. 2008)

(emphasis in original) (quoting *Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 184 (2d Cir. 2006)), it

is, in fact, an *employer's* "duty reasonably to accommodate an employees's disability if the disability is *obvious* – which is to say, if the employer knew or reasonably should have known that the employee was disabled." *Id.* (emphasis added).  The Second Circuit continued: "But what does accommodation mean, if the employee does not request specific accommodation?  We have held that the ADA contemplates that employers will engage in 'an interactive process' [with their employees and in that way] work together to assess whether an employee's disability can be reasonably accommodated." *Id.* (citing *Jackan v. New York State Department of Labor*, 205 F.3d 562, 566 (2d Cir. 2000)); *see also, e.g., Felix v. New York Transit Authority,* 154 F.Supp. 2d 640, 657 (S.D.N.Y. 2001) (stating that a request for accommodation is not a prerequisite to liability for failure to accommodate "where the disability is obvious or otherwise known to the employer without notice from the employee.").

The evidence Plaintiff has provided more than demonstrates that he *did* put Defendant on notice that he had diabetes.  Firstly, Plaintiff submitted a Family Medical Leave Act form to Deborah Delgado, Defendant's Human Resources Manager, several months before his termination.  The information on the form, signed by Plaintiff's doctor on March 5, 2009, and stamped "[r]eceived March 11, 2009," states that on February 24, 2009 Plaintiff had been diagnosed with diabetes and had been admitted to Yale New Haven Hospital for hyperglycemia, dehydration, and  tachycardia, with a blood sugar level above 500.  [Doc. 35-7] at 1.  Plaintiff's doctor indicated that Plaintiff had missed several days of work due to his diabetes-related illness, and that he was expected to be able to return to work by March 8, 2009.  *Id.*  Even if this did not somehow constitute reasonable notice to Defendant – given that in this note the doctor stated that he did not expect Plaintiff to take work only intermittently; to work on a less than full schedule as a result of his medical condition; or to

experience "episodes of incapacity" or miss additional work, *see id.* at 1-2 – this in combination with notice given by Plaintiff in the immediate wake of his accident (both in the form of verbal comments to supervisors and other work superiors, including Deubel and Vasquez and in the form of additional doctor-signed medical documents which were in the possession and reviewed by various individuals involved with Plaintiff's discharge and denied appeal) and the fact of Plaintiff's accident itself clearly constitutes notice sufficient to withstand a motion for summary judgment under the precedent set by the Second Circuit in *Brady v. Wal-Mart Stores, Inc.* and like cases.  Thus, and contrary to Defendant's arguments, there is no further requirement that Plaintiff *ask* for accommodation under such circumstances.

Moreover, the Court notes Plaintiff's additional assertions that in fact he *did* request particular medical-related accommodations, claiming he had told his immediate supervisor "that working on the transfer car was causing his ankles to swell and that the job was too much for him," and that in addition he "made a similar complaint to his union who notified" his supervisor as well, *see* [Doc. 35] at 45.  Plaintiff's acting supervisor in charge of the shift has testified that on the evening on which Plaintiff passed out, Plaintiff advised the acting supervisor that Plaintiff was not feeling well, and that the acting supervisor had "brushed [Plaintiff] off." [Doc. 35-9] at 3.  From this evidence, a reasonable jury could conclude that requests for accommodations were indeed made by Plaintiff under any extant relevant standard.

Given that Defendant did in fact have notice of Plaintiff's disability, and given that Defendant did not, prior to Plaintiff's termination, engage with Plaintiff in any sort of "interactive process" by which the parties "work[ed] together to assess whether [Plaintiff's] disability [could] be reasonably accommodated" as described by the Second Circuit in 2000 and reiterated by the Second Circuit in

2008, *see Jackan v. New York State Department of Labor*, 205 F.3d at 556; *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d at 135-36, the Court finds that a jury could permissibly find that Plaintiff is able to meet this last prong of a prima facie claim that Defendant failed to provide reasonable accommodation under the ADA. Plaintiff therefore survives summary judgment on any such prima facie claim.

Pursuant to the *McDonnell Douglas* burden-shifting test described and applied *supra*, "the burden of production [now] shifts to the employer to provide a legitimate, nondiscriminatory reason for its decision" – here, for its failure to attempt to reasonably accommodate Plaintiff under the ADA. *See Thompson v. New York City Department of Probation*, 348 Fed. Appx. 643, 645 (2d Cir. 2009). Defendant has articulated no such reason in its pleadings, except to contend that Plaintiff made no accommodation request so Defendant had no obligation to pursue accommodations. Such arguments, and why they fail in this Motion for Summary Judgment, have already been addressed *supra*. However, even if Defendent were able to articulate a legitimate reason for its decision, a reasonable jury could still find that Plaintiff has adequately demonstrated the facts necessary to prevail on an ADA failure to accommodate claim. Consequently, Plaintiff's claims with respect to Defendant's failure to reasonably accommodate under the ADA survive Defendant's Summary Judgment Motion.

### 4.    Plaintiff's ADA Retaliation Claim

In order to establish a prima facie case of retaliation under the ADA, Plaintiff must show that: (1) he engaged in an activity protected by the ADA; (2) Defendant was aware of this activity; (3) Defendant made an adverse employment action against Plaintiff; and (4) a causal connection exists between the alleged adverse employment action and the ADA-protected activity in which Plaintiff

engaged.  *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002).  Claims for retaliation under the ADA are analyzed under the *McDonnell Douglas* burden-shifting analysis, described *supra*.  *See id.*

Plaintiff's Amended Complaint cites what are essentially three different instances of Defendant's alleged retaliation.  The first is that "[u]pon receipt of medical documentation demonstrating that Plaintiff had in fact passed-out on the job, Defendant retaliated against ... Plaintiff and wrongfully terminated Plaintiff rather than offer reasonable accommodation in violation of the anti-retaliation provisions of the ADA." [Doc. 21] at ¶ 79.  Specifically on this allegation, Plaintiff avers that "Defendant retaliated against ... Plaintiff by [cancelling] Plaintiff's medical insurance ... [several] ... days prior to Plaintiff's actual date of termination, causing ... Plaintiff financial harm and an inability to receive necessary medical treatment." *Id.* at ¶ 80.  The second instance Plaintiff cites for his claim of retaliation under the ADA is Defendant's behavior during the grievance procedure and resulting arbitration, during which Plaintiff states Defendant "provided altered and/or false documentation to justify [Plaintiff's] wrongful termination." *Id.* at ¶¶ 81-82.  The third instance is Defendant's general and presumably ongoing refusal "to compensate Plaintiff for his nine (9) months of lost income, medical expense[,] and other resulting damages." *Id.* at ¶ 84.

With respect to Plaintiff's claim that Defendant retaliated against him for having provided medical documentation that Plaintiff had passed out on the job rather than merely hidden and fallen asleep, Defendant contends that Plaintiff "does not allege or testify that he engaged in any sort of protected activity prior to the termination decision," but rather that this particular aspect of Plaintiff's retaliation claim "is premised upon [Plaintiff's] allegation that [Defendant] terminated him upon receipt of medical documentation purportedly justifying his conduct on the night he fell asleep."

[Doc. 27] at 15.  Given that providing medical information is not a "protected activity" under the ADA, Defendant argues, Plaintiff's premise does not and cannot support a retaliation claim.  *Id.* Plaintiff responds to Defendant's arguments, stating that "because ... Defendant was on notice that Plaintiff had a disability and had requested accommodations prior to his termination, Plaintiff engaged in protected activity and satisfies the first and only disputed element of his retaliation claim."  [Doc. 35] at 47.

The other argument Defendant raises with respect to this aspect of Plaintiff's ADA retaliation claim is that the objective of the retaliation provision of the ADA "is obviously to forbid an employer from retaliating against an employee because of the latter's opposition to an unlawful employment practice." [Doc. 27] at 30 (citation omitted).  It is true that the retaliation provision of the ADA, 42 U.S.C. § 12203, provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a).    However, this district has more than once cited "a request for reasonable accommodation" as one "example of a protected activity" under the ADA. *Bayonne v. Pitney,* 3:03-CV-00712, 2004 WL 213168 at *2 (D.Conn. Jan. 27, 2004).  Only a few months ago, this district found that a plaintiff who "requested an accommodation for his back condition and was refused it and terminated instead" survived summary judgment on an ADA retaliation claim even when the plaintiff had not "assert[ed] that the adverse employment action resulted from his participation in an ADA investigation, proceeding, or hearing." *Palmieri v. City of Hartford*, _ F.Supp. 2d. _, 2013 WL 2398365 at *17 (D.Conn. 2013).

Here, Plaintiff contends that his requests for reasonable accommodation prior to his

27

termination, addressed *supra*, satisfy the first element necessary for a prima facie claim of retaliation under the ADA – i.e., that Plaintiff had engaged in a protected activity.  While the Court finds this somewhat tenuous, it nonetheless presents genuine issues of material fact for a jury to decide.  The Court thus finds that Plaintiff has set forth sufficient evidence that Defendant was aware of Plaintiff's aforementioned requests for reasonable accommodation; that Defendant made adverse employment actions against Plaintiff; and that a plausible causal connection exists between these alleged adverse employment actions and the requests for accommodation, of which, Plaintiff avers, the presentation of a medical form could be construed as one more.

Puzzlingly, Defendant does not appear to address the other two aforementioned aspects of Plaintiff's ADA retaliation claims at all in the pleadings, instead focusing upon whether Plaintiff is able to provide evidence that he has been retaliated against *at work* after his return to Defendant's employ in May of 2010, and whether Plaintiff is able to establish whether, while *at work* from that time through the present, that he suffered an adverse employment action.  *See, e.g.,* [Doc. 27] at 5, 30-31; [Doc. 43] at 23-24.  Regardless of the veracity of such contentions, they are inapposite, as Plaintiff's claims of retaliation under the ADA stem from what Plaintiff has alleged was Defendant's retaliation "against ... Plaintiff by [cancelling] Plaintiff's medical insurance ... [several] ... days prior to Plaintiff's actual date of termination, causing ... Plaintiff financial harm and an inability to receive necessary medical treatment," as well as from Defendant's behavior during the grievance procedure and resulting arbitration, during which Plaintiff states Defendant "provided altered and/or false documentation to justify [Plaintiff's] wrongful termination," and from Defendant's general and presumably ongoing refusal "to compensate Plaintiff for his nine (9) months of lost income, medical expense[,] and other resulting damages." [Doc. 21] at ¶¶ 80-84.  After examining the record, the

Court finds that Plaintiff has set forth evidence sufficient to support a prima facie claim on these remaining aspects of his ADA retaliation claim.

Even assuming that Defendant *could* present a legitimate reason for the adverse employment actions under the burden-shifting analysis appropriate in this inquiry – and the Court notes that Defendant does not explicitly attempt to do so in its pleadings – the Court finds that evidence on record, discussed extensively *supra,* raises a material issue of fact as to whether any such purported reason was in fact pretext for retaliation.  Accordingly, the Court denies Defendant's Motion for Summary Judgment as to the ADA retaliation claim.

## B.     Plaintiff's CFEPA Claims

"Connecticut courts generally analyze ADA and CFEPA claims under the same standard." *Buck v. AT&T Services, Inc.*, 3:08-CV-01619, 2010 WL 26400045 at *1 n.1 (D.Conn. June 28, 2010).  "The standards governing discrimination under CFEPA are the same as those governing ADA claims." *Wannamaker v. Westport Board of Education*, 899 F.Supp. 2d 193, 212 (D.Conn. 2012) (citation omitted).  Due to this, as the Connecticut Supreme Court has noted, Connecticut state courts will "look to federal law for guidance on interpreting state employment discrimination law," as "the analysis is the same under both." *Craine v. Trinity College*, 259 Conn. 625, 637 n.6 (Conn. 2002).

Pursuant to CFEPA, it is prohibited for an employer to "refuse to hire or employ or to bar or discharge from employment any individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment because of the individual's ... present or past history of ... physical disability." C.G.S.A. § 46a-60(a)(1). If anything the language contained in the state statute defines disability *more* broadly than comparable section of the ADA,

the language of which has been quoted *supra*; accordingly, in situations in which a Defendant is found to have acted discriminatorily under the ADA, that Defendant will also be found to have acted discriminatorily under the CFEPA. *See, e.g., Martinsky v. City of Bridgeport*, 504 Fed. Appx. 43 (2d Cir. 2012) (noting and reaffirming the Second Circuit's belief that the CFEPA's definition of physical disability is broader than the ADA's).

As this Court has already ruled that Plaintiff's claims for discrimination and retaliation survive summary judgment, it holds similarly with respect to Plaintiff's comparable claims under state law – i.e., under C.G.S.A. § 46a-60(a)(1) and C.G.S.A. § 46a-60(a)(4).

## C.    Plaintiff's FMLA Claim

Plaintiff claims that Defendant violated his rights under the FMLA when, subsequent to Plaintiff's passing out at work in August of 2009, "[r]ather than immediately plac[ing] Plaintiff on FMLA leave, he was terminated as a direct result of his disability." [Doc. 21] at ¶ 126.[5]

As an initial matter, Defendant avers that "Plaintiff's FMLA claims should not survive summary judgment for several reasons," the first of which being that "Plaintiff entered into a Settlement Agreement with [Defendant] that expressly released [Defendant from every claim from the beginning of time until [Plaintiff's job] reinstatement, *with the exception of* [Plaintiff's] then[-]pending Complaint with the CHRO and ... then[-]pending Charge with the EEOC or *any litigation arising out of said Charges.*" [Doc. 27] at 6 (emphasis added).  Defendant's claim is somewhat puzzling, as Plaintiff's CHRO Charge of Discrimination Affidavit, claimed, among other things, that Defendant "violated the Family Medical Leave Act." [Doc. 35-19] at 3.  The Settlement Agreement

---

[5]   While Defendant avers that it is unclear whether Plaintiff brings his FMLA claim under state or federal law, it is apparent from Plaintiff's pleadings that Plaintiff intends to bring this claim under federal law.

facially omits from the general release any litigation arising out of charges contained in Plaintiff's CHRO Complaint and EEOC Charge.  *See* [Doc. 35-15] at 2.  Plaintiff's FMLA claims were contained within at least Plaintiff's CHRO Complaint; this litigation arises from, among other things, that charge.

The Court further notes its puzzlement with Defendant's aforementioned argument as the Settlement Agreement clearly states: "[Plaintiff] agrees to release [Defendant] from any and all claims he has or may have, from the beginning of time until the date of his reinstatement arising out of his employment with [Defendant] *that allege a violation of the collective bargaining agreement*." *Id.* (emphasis added).  This is an admittedly narrow exemption, but it is the exemption contained within the contractual language.  Plaintiff's claim for interference with his FMLA rights does not facially allege any violation on Defendant's part of the collective bargaining agreement, which is a labor agreement between Defendant and its workers' union, of which Plaintiff is a member.  *See* [Doc. 35-21].  Accordingly, even if Plaintiff's FMLA claims were not contained within at least Plaintiff's CHRO Complaint, Defendant's contention that Plaintiff cannot bring such claims before this Court would have little merit.  This Court therefore holds that Plaintiff has not waived his ability to bring the FMLA claim brought in this action.

"The FMLA contains prescriptive protections that are expressed as substantive statutory rights." *Gauthier v. Yardney Technical Prods., Inc.*, 2007 WL 2688854 at *4 (D. Conn. Sept. 13, 2007) (citation omitted).  Specifically, pursuant to 29 U.S.C. § 2615(a)(1), it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the FMLA.  29 U.S.C. § 2615(a)(1).  "While the FMLA does not define the term 'interference,' the United States Department of Labor has promulgated a regulation explaining that

31

'interfering with the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave.  It would also include manipulation by a covered employee to avoid responsibilities under the FMLA." *Ridgeway v. Royal Bank of Scotland Group*, 3:11-CV-00976, 2012 WL 1033532 at *6 (D.Conn. March 27, 2012) (quoting 29 C.F.R. § 825.220(b) (some internal quotation marks omitted)).  Accordingly, in order to establish an FMLA interference claim pursuant to 29 U.S.C. § 2615(a)(1), a plaintiff need prove that his or her employer "in some manner impeded the employee's exercise of [those rights which are] afforded substantive protection under the FMLA.  A plaintiff bears the burden of establishing only a prima facie case for interference claims, and the court need not entertain the issue of the employer's intent."  *Gauthier v. Yardney Technical Prods., Inc.*, 2007 WL 2688854 at *4 (internal citations and quotation marks omitted); *see also Weichman v. Chubb & Son*, 552 F. Supp. 2d 271, 288 (D. Conn. 2008) (stating that for FMLA interference claims, a plaintiff "need only prove by a preponderance of the evidence that her taking of FMLA-protected leave constituted a negative factor in the decision to terminate her.") (quoting *Sista v. CDC Ixis North America, Inc.*, 445 F.3d 161, 175-76 (2d Cir. 2006)).

In order to make out a prima facie case for interference with FMLA-protected leave, a plaintiff must therefore demonstrate that: (1) the plaintiff is an eligible employee under the FMLA; (2) the defendant constitutes an employer under the FMLA; (3) the plaintiff is entitled to leave under the FMLA; (4) the plaintiff gave notice to the defendant of his or her desire to take an FMLA leave; and (5) the defendant denied the benefits to which the plaintiff was entitled under the FMLA. *Gauthier v. Yardney Technical Prods., Inc.*, 2007 WL 2688854 at *5.  A plaintiff may "prove this claim, as one might any ordinary statutory claim, by using either direct or circumstantial evidence,

or both." *Weichman v. Chubb & Son*, 552 F. Supp. 2d at 288 (quoting *Sista v. CDC Ixis North America, Inc.*, 445 F.3d at 175-76).

Neither party disputes in any pleading that Plaintiff is an eligible employee under the FMLA or that Defendant constitutes an employer under the FMLA; accordingly, the Court will assume for the purposes of this summary judgment ruling that both are true, as is supported by the record in this matter. The only element of a prima facie FMLA interference claim Defendant addresses, in fact, is whether Plaintiff "notified the company of his intention to take FMLA leave." [Doc. 27] at 7; *see also, e.g., id.* at 43-44 ("To assert a prima facie case for FMLA interference, Plaintiff must show he gave notice of his plan to take leave and that he was denied benefits.") (emphasis omitted). Defendant initially avers that "[n]owhere within Plaintiff's deposition testimony or in the allegations contained in his Complaint does he contend he gave notice to [Defendant] that he needed FMLA leave," and that under existing caselaw "[e]ven in unforseeable circumstances, a plaintiff must notify his employer, as soon as practicable, of his intention to take FMLA leave. Because ... Plaintiff, as a matter of undisputed fact, never provided notice to his employer of his need to take FMLA leave, the FMLA claim should be dismissed." *Id.* at 44. In Defendant's reply memorandum to Plaintiff's opposition to the Motion for Summary Judgment, Defendant slightly amends its contentions with respect to Plaintiff's FMLA claim:

> [Defendant] complied with all aspects of its obligations under the FMLA. The only times Plaintiff requested FMLA both in March 2009 and January 2011, it was granted. [Plaintiff's] FMLA claim ... does not make any sense and is complete nonsense.... Whether [Plaintiff] fell asleep or passed out, his FMLA rights never came into play. He presented one note [prior to his termination], dated August 21, 2009, advising he may miss a day or two of work and that he suffered from acute illness/dehydration ... it made no mention of chronic illness – in fact, it stated the opposite – "acute illness." ... Plaintiff was not terminated because he was absent for two days after the incident. The FMLA does not and would not save him from being terminated from falling asleep on the job. It is simply a non-issue.

33

[Doc. 43] at 25-26.

Pursuant to 29 C.F.R. § 825.303, "[w]hen the approximate timing of the need for leave is not forseeable, an employee must provide notice to the employer as soon as practicable under the facts and circumstances of the particular case." 29 C.F.R. § 825.303(a). "When an employee seeks leave for the first time for a[n] FMLA-qualifying reason, the employee need not expressly assert rights under the FMLA or even mention the FMLA." 29 C.F.R. § 825.303(b). However, "[w]hen an employee seeks leave due to a qualifying reason[] for which the employer has previously provided the employee FMLA-protected leave, the employee must specifically reference either the qualifying reason for leave or the need for FMLA leave." *Id.* Either way, "[t]he employer will be expected to obtain any additional required information through informal means." *Id.*

Plaintiff and Defendant agree that Plaintiff had previously taken FMLA leave in March of 2009; accordingly, it was Plaintiff's obligation to mention either the qualifying reason for the leave he states he required in August of 2009 or the need for FMLA leave. *See* 29 C.F.R. § 825.303(b). Plaintiff appears to have done exactly that when he attempted to furnish at least one of these forms to the individual in charge of Human Resources for Defendant, Deborah Delgado, who herself states that when Plaintiff attempted to give them to her in an exchange in which Plaintiff avers he mentioned his illness and the need for leave, *see, e.g.,* [Doc. 36] at 52, she responded: "What do you want me to do with these? Like you don't have FMLA for this. What do you want me to do?" [Doc. 35-8] at 29. Delgado further states that she then spoke with Barry Besen, Defendant's Chief Operating Officer, Executive Vice President, and General Manager, remarking to him that Plaintiff had submitted them "after the fact, so [Delgado did not] know why [Defendant] would accept them." *Id.* Delgado states that Besen told her that she "shouldn't accept those notes," and that she is unsure

as to whether she kept them. *Id.* Delgado also affirms that in the course of preparations for Plaintiff's termination, Besen asked her if Plaintiff "had family medical leave paperwork," to which she responded "yes." *Id.* at 13. Delgado also states that she provided Besen with that paperwork. *Id.* at 15. She and Besen then discussed if Plaintiff "ha[d] a current medical condition." *Id.* at 13. Ultimately, Delgado states, it was decided that Plaintiff "was to be terminated for sleeping on the job because [Defendant] had other employees that were terminated for sleeping on the job and ... [it] needed to remain consistent in [its] dealings with others." *Id.*

This Court finds that there is *at minimum* a remaining question of material fact as to whether Plaintiff has met the FMLA leave notice requirements specified in the language of 29 C.F.R. § 825.303(b) – and that it is likely, given the testimony and entirety of the record, that Plaintiff met them. Given the record, the Court also holds that *at minimum* there remains a question of material fact with respect to the remaining two elements of a prima facie FMLA interference claim – that Plaintiff is entitled to leave under the FMLA and that Defendant denied the benefits to which the plaintiff was entitled under the FMLA – and, as with the notice element, it appears likely that Plaintiff meets both these elements.

As noted *supra*, in order to establish an FMLA interference claim pursuant to 29 U.S.C. § 2615(a)(1), a plaintiff need prove that his or her employer "in some manner impeded the employee's exercise of [those rights which are] afforded substantive protection under the FMLA," and therefore bears only "the burden of establishing only a prima facie case for interference claims, and the court need not entertain the issue of the employer's intent." *Gauthier v. Yardney Technical Prods., Inc.*, 2007 WL 2688854 at *4 (internal citations and quotation marks omitted); *see also Weichman v. Chubb & Son*, 552 F. Supp. 2d 271, 288 (D. Conn. 2008). As a more than colorable question of

material fact remains as to several of these elements, Plaintiff's FMLA interference claim survives

summary judgment.[6]

### D.     Plaintiff's Emotional Distress State Law Claims

Plaintiff brings two emotional distress claims under state law: intentional infliction of

emotional distress and negligent infliction of emotional distress.

With respect to the former – i.e., intentional infliction of emotional distress – Plaintiff avers

that Defendant's conduct was "extreme and outrageous, ... beyond the bounds of decency and ...

intolerable in the workplace." [Doc. 21] at ¶¶ 121-122. Specifically, Plaintiff states that "Defendant's

conduct of taking no action and disregarding Plaintiff's disability" and "Defendant's conduct of

sending Plaintiff home without notifying a union representative and/or ensuring his safety and well-

being following a medical episode on the job [were] beyond the bounds of decency and was

negligent;" that "Defendant knew or should have known that Plaintiff's termination would likely

---

[6]   The Court also notes that "[t]he Second Circuit has recognized the potential for an interference cause of action premised upon 'an employer's failure to post a notice where that failure leads to some injury.'" *Id.* (citation omitted).  In *Kosakow v. New Rochelle Radiology Assoc.*, 274 F.3d 706 (2d Cir. 2001), the Second Circuit looked to and addressed an Eastern District of Pennsylvania decision which recognized a cause of action based on deficiencies of notice and other similar misleading information which resulted in an employee's frustrated ability to exercise the right to take an FMLA leave.  *See Kosakow v. New Rochelle Radiology Assoc.*, 274 F.3d at 723-24.  While in that instance the Second Circuit ultimately held that such a proposition could not apply given the particular facts in question, it nonetheless both recognized and set precedent for such an analysis.  *See, e.g., Ridgeway v. Royal Bank of Scotland Group*, 2012 WL 1033532 at *6-7 (reaching same conclusion with respect to precedent set by the Second Circuit in *Kosakow v. New Rochelle Radiology Assoc.*).  As this district noted last year, an interpretation of "[s]uch a cause of action is consistent with the prevailing standard for an interference claim within the Second Circuit, requiring that the purported interference ultimately results in the denial of a benefit under the FMLA.  Where the employee is not provided with the necessary information regarding the employer's FMLA leave policies, the employee is denied the ability to conform [any] desired period of leave to the empployer's policies so as to preserve the right to reinstatement, a benefit at the crux of the FMLA's provisions."  *Id.* at *7.

result in the severe emotional distress of the Plaintiff;" that "Defendant's refusal to accommodate, investigate[,] or intercede was extreme and outrageous conduct which Defendant should have reasonably known would result in severe emotional distress to ... Plaintiff;" that "Defendant's action of failing to accommodate ... Plaintiff; removing Plaintiff from the workplace without pay; cancelling his medical benefits without notice retroactive to [a] date prior to this termination; blocking Plaintiff from procuring unemployment benefits; and causing ... Plaintiff monetary losses was extreme and outrageous;" that "Defendant's action of reinstating Plaintiff into his position following the grievance procedures, but refusing and failing to compensate Plaintiff for his lost time from the job was extreme and outrageous" and that "Defendant's actions of submitting false, forged[,] and/or altered documentation to the Department of Labor and/or the Commission on Human Rights and Opportunities was extreme and outrageous." *Id.* at ¶¶ 123-129.

With respect to the latter – i.e., negligent infliction of emotional distress – Plaintiff avers that "Defendant engaged in conduct that [it] should have realized involved an unreasonable risk of causing emotional distress and that [such] distress might result in illness or bodily injury," including several of the acts described immediately *supra* with respect to Plaintiff's claim for intentional infliction of emotional distress. *See id.* at 18 ("Plaintiff incorporates paragraphs Seventy-Six (76) through Eighty-Six (83) of COUNT THREE as if more fully set forth herein."). Plaintiff avers that "Defendant's conduct of sending Plaintiff home without ensuring his safety and well-being following a medical episode on the job was beyond the bounds of decency and was negligent." *Id.* at ¶¶ 133-134.[7]

---

[7]   Defendant incorrectly states that the sole basis for Plaintiff's claim for negligent infliction of emotional distress is that "he should have been offered help on the night in question as he should have been escorted with his Union to find out what is going on." [Doc. 27] at 49

Defendant raises three general arguments with respect to why the Court ought to grant summary judgment on Plaintiff's emotional distress claims. The first is that these claims "were released and not preserved under the Settlement Agreement." [Doc. 27] at 44. The second is that these claims are "barred by the exclusivity provisions of Connecticut Workers' Compensation stature, § 31-284(a)," as "[w]here [this statute] covers a claim, statutory compensation is the sole remedy and recovery in common law tort against the employer is barred." *Id.* at 44-45 (internal quotation marks and citation omitted). The last is that Plaintiff fails to state a cause of action for either claim. *See id.* at 46, 49.

For the same reasoning articulated *supra* with respect to similar arguments raised by Defendant with respect to Plaintiff's FMLA claim and the Settlement Agreement, the Court finds that the narrow exemption provided within the Settlement Agreement – "[Plaintiff] agrees to release [Defendant] from any and all claims he has or may have, from the beginning of time until the date of his reinstatement arising out of his employment with [Defendant] *that allege a violation of the collective bargaining agreement*" [Doc. 35-17] at 2 (emphasis added) – does not in any way curtail Plaintiff's ability to bring these tort claims, which do not facially allege any violation on Defendant's part of the collective bargaining agreement, which is a labor agreement between Defendant and its workers' union, of which Plaintiff is a member. *See* [Doc. 35-21].

With respect to Defendant's argument that Plaintiff's emotional distress claims are barred by

---

(citation omitted). However, it is clear from the Amended Complaint that this claim rests on more assertions than merely the one to which Defendant referred. *See* [Doc. 21] at 18 ("Plaintiff incorporates paragraphs Seventy-Six (76) through Eighty-Six (83) of COUNT THREE as if more fully set forth herein," presumably in support of Plaintiff's contention that "Defendant engaged in conduct that Defendant should have realized involved an unreasonable risk of causing emotional distress and that distress might result in illness or bodily injury.").

Connecticut's Workers' Compensation Act, specifically C.G.S.A. § 31-284(a): this statute provides in relevant part that "[a]n employer who complies with [certain requirements] shall not be liable for any action for damages *on account of personal injury* sustained by an employee arising out of and in the course of his employment ... All [such] rights and claims ... arising out of personal injury or death sustained in the course of employment are abolished...." C.G.S.A. § 31-284(a) (emphasis added). However, the Connecticut Workers' Compensation Act itself provides that the term "[p]ersonal injury ... *shall not be construed to include* ... [a] *mental or emotional impairment*, unless such impairment ... arises from a physical injury or occupational disease," or, for that matter, "[a] *mental or emotional impairment that results from a personnel action*, including, but not limited to, a transfer, promotion, demotion[,] or termination." C.G.S.A. § 31-275(16)(B) and 31-275(16)(B)(ii) and (iii) (emphasis added).

By their very nature, Plaintiff's emotional distress claims are mental and emotional in nature; these emotional distress claims do not arise from either a physical injury or an occupational disease; and they do arise from various personnel actions taken by Defendant. Defendant's contention that these claims are barred by the Connecticut Workers' Compensation Act are therefore without merit, as the exclusivity provision of Connecticut's Workers Compensation Act does pertain to these types of tort claims. Indeed, the Court notes that the Workers' Compensation Act was specifically *amended in 1993 to exclude the aforementioned types of mental and emotional impairments* "from the definition of personal injury, and thus from the bar of the [Act]." *Meyers v. Arcudi*, 915 F.Supp. 522, 524 (D.Conn. 1996).

Defendant has also made a motion to amend its "Answer to [a]ssert the Workers' Compensation Bar" as an affirmative defense. *See* [Doc. 25], [Doc. 27] at 45. While in general

39

leave to amend pleadings should be freely given pursuant to Fed. R. Civ. P. 15, any such amendment here would be futile, as for the reasoning articulated immediately above the Connecticut Workers' Compensation Statute's exclusivity provision in not applicable to Plaintiff's tort claims.  "A district court has discretion to deny leave [to amend] for good reason, including futility...."  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  The Court accordingly DENIES Defendant's Motion to so-Amend its Answer.

The Court now turns to Defendant's last argument with respect to these emotional tort claims: that Plaintiff has failed to state a cause of action for either claim.

### 1.      Plaintiff's Claim for Intentional Infliction of Emotional Distress

In order for Plaintiff to prevail in a case for liability under intentional infliction of emotional distress, he must show that: (1) Defendant intended to inflict emotional distress or that Defendant knew or should have known that emotional distress was the likely result of its conduct; (2) that the conduct was extreme and outrageous; (3) that Defendant's conduct was the cause of Plaintiff's distress; and (4) that the emotional distress sustained by Plaintiff was severe.  *Garcia v. Hebert*, 3:08-CV-00095, 2013 WL 1294412 at *9 (D.Conn. March 28, 2013); *see also Appleton v. Board of Education of Town of Stonington*, 254 Conn. 205, 210 (Conn. 2000).  As the Connecticut Supreme Court has commented, "[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Appleton v. Board of Education of Town of Stonington*, 254 Conn. at 210-11 (citation omitted).

Thus "[c]onduct on the part of the defendant that is merely insulting or displays bad manners

or results in hurt feelings is stress insufficient to form the basis for an action based upon intentional infliction of emotional distress." *Id.* at 211.  Generally, then, a case in which liability is found for intentional infliction of emotional distress "is one in which the recitation of facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Id.*  (citation omitted).  "Only where reasonable minds disagree does it become an issue for the jury." *Id.* at 210 (citation omitted).

This standard is admittedly high.  Nonetheless, given the record in this matter, the Court holds that a reasonable jury could find that Defendant's behavior is sufficient to meet such a standard.  Plaintiff has presented evidence supporting his allegations that:  Defendant knew Plaintiff had diabetes prior to its decision to terminate him; when Plaintiff notified Defendant that his diabetes had caused him to pass out, Defendant did not offer or discuss any accommodation, and instead informed Plaintiff that the medical document(s) he attempted to provide would not aid him; Defendant did not interview or question the supervisor on duty the night of Plaintiff's passing out; Defendant did not question the only witness to the incident; Besen himself asked for and reviewed Plaintiff's medical forms during the investigation concerning Plaintiff's passing out, yet he continued to question whether Plaintiff had not merely fallen asleep on the job and tried to hide his doing so; Defendant cancelled Plaintiff's insurance prior to Plaintiff's termination, making it retroactive to the night of the incident, and yet continued to take out insurance payments for an additional five weeks; and Defendant did not investigate whether Plaintiff had a legitimate reason to be where he was when he passed out until years after the incident.

As Connecticut courts have noted, "the extreme and outrageous character of the conduct" involved in a finding of intentional infliction of emotional distress "may rise from the actor's

41

knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity.  The conduct may become heartless, flagrant, and outrageous when the actor proceeds in the face of such knowledge, where it would not be so if he did not know." *Mellaly v. Eastman Kodak Co.*, 42 Conn. Supp. 17, 20 (Conn. Super. 1991) (quoting Restatement (Second), Torts § 46, comment f) (internal quotation marks omitted)); *see also e.g., Cyrus v. Papa's Dodge Inc.*, 3:10-CV-00021, 2012 WL 1057310 at *5 (D.Conn. March 28, 2012) (citing and applying same).  Given that Defendant's alleged conduct took place with knowledge of Plaintiff's physical illness, a jury could reasonably find that Defendant's actions rise to such a level, as given the evidence on record it is entirely possible that reasonable people could differ about the egregiousness of Defendant's such conduct.  "Where reasonable men may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability."  *Cyrus v. Papa's Dodge Inc.*, 2012 WL 1057310 at *5 (quoting Restatement  (Second), Torts § 46, comment h).  Plaintiff's claim for intentional infliction of emotional distress therefore survives summary judgment.

## 2.    Plaintiff's Claim for Negligent Infliction of Emotional Distress

Defendant also moves this Court to grant summary judgment with respect to Plaintiff's claim for negligent infliction of emotional distress because "Plaintiff has not sustained his factual burden." [Doc. 27] at 49.  To prevail on a claim of negligent infliction of emotional distress, Plaintiff must plead and prove that: (1) Defendant's conduct created an unreasonable risk of causing Plaintiff severe emotional distress; (2) Plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) Defendant's conduct was the cause of Plaintiff's distress.  *See Stancuna v. Schaffer*, 122 Conn. App. 484, 490 (Conn. App. 2010) (citing

*Davis v. Davis*, 112 Conn. App. 56, 68 (Conn. App. 2009)).

For the reasoning articulated *supra* with respect to Plaintiff's claim for intentional infliction of emotional distress, and in particular in light of the evidence concerning Defendant's alleged actions given the demonstration of Defendant's knowledge of Plaintiff's medical condition, the Court finds that a jury could reasonably find that Defendant's actions rise to such a level, as given the evidence on record it is entirely possible that reasonable people could differ as to whether Defendant's conduct met the elements necessary to prevail on a claim of negligent infliction of emotional distress.  "Where reasonable men may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability."  *Cyrus v. Papa's Dodge Inc.*, 2012 WL 1057310 at *5 (quoting Restatement (Second), Torts § 46, comment h).  Accordingly, Plaintiff's claim of negligent infliction of emotional distress survives summary judgment.

**V.      Conclusion**

For the forgoing reasons, Defendant's Motion for Summary Judgment [Doc. 25] is DENIED in all respects.  Defendant's Motion for Leave to Amend Its Answer [Doc. 25] is also DENIED.

It is SO ORDERED.

Dated:  New Haven, Connecticut
           November 27, 2013

/s/ *Charles S. Haight, Jr.*
Charles S. Haight, Jr.
Senior United States District Judge